# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| DERMATOLOGY ASSOCIATES OF SAN ANTONIO, DERMSA MANAGEMENT, INC., and WILLIAM T. PARSONS, M.D., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 2017-0665-KSJM |
| OLIVER STREET DERMATOLOGY MANAGEMENT LLC, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  May 5, 2020
Date Decided:  August 10, 2020

S. Mark Hurd, Lauren Neal Bennett, MORRIS, NICHOLS, ARSHT, & TUNNELL LLP, Wilmington, Delaware; James G. Ruiz, Rebecca Bergeron, WINSTEAD PC, Austin, Texas; *Counsel for Plaintiffs Dermatology Associates of San Antonio, DermSA Management, Inc., and William T. Parsons, M.D.*

Rudolf Koch, Robert L. Burns, Daniel E. Kaprow, RICHARDS, LAYTON, & FINGER, P.A. Wilmington, Delaware; William Trach, David Rowe, LATHAM & WATKINS LLP, Boston, Massachusetts; *Counsel for Defendant Oliver Street Dermatology Management LLC.*

**McCORMICK, V.C.**

This post-trial decision resolves the claim that the defendant wrongfully terminated an agreement to acquire the plaintiffs' Texas-based dermatology practice. The plaintiffs contend that the defendant failed to provide notice of termination by the contractual deadline and that the defendant lacked a proper basis for termination.

This decision finds that the notice of termination was timely. The termination provision required the defendant to give notice of termination prior to or at closing. The parties neither participated in a closing nor agreed upon a date for closing, so the deadline never passed.

This decision also finds that the defendant had a proper basis for termination. The termination provision granted the defendant the right to terminate if the plaintiffs failed to satisfy certain closing conditions or if it became impossible to satisfy those conditions at closing. The defendant cited two closing conditions as grounds for termination: the plaintiffs' obligation to obtain third-party consents from the company's landlords, and the plaintiffs' obligation to deliver a bring-down certificate stating that the representations and warranties were true and correct in all material respects. Because closing never occurred, the deadline for satisfying the closing conditions never expired. Thus, the plaintiffs' claim hinges on whether it was impossible to satisfy the two closing conditions.

This decision finds that it was possible for the plaintiffs to supply the landlord consents, but it was impossible for the plaintiffs to satisfy the bring-down condition.

After signing, two of the plaintiffs' physicians responsible for over 10% of the company's revenue stated their intent to resign. The anticipated loss of revenue generated by these physicians would have prevented the seller from certifying that its related representations and warranties were true in all material respects at the time of closing. Judgment is therefore entered in favor of the defendant.

## I. FACTUAL BACKGROUND

Trial took place over two days. As reflected in the Schedule of Evidence submitted by the parties,[1] the record comprises 342 trial exhibits, live testimony from four fact and two expert witnesses, deposition testimony from nine fact and two expert witnesses, and twenty stipulations of fact.[2] These are the facts as the Court finds them after trial.

### A. DermSA and Oliver Street

Plaintiff William T. Parsons, M.D. founded and owned Plaintiffs Dermatology Associates of San Antonio ("Associates") and DermSA Management, Inc. ("Management," and with Associates, "DermSA").[3] DermSA operated a dermatology and cosmetic medicine practice at three locations in the San Antonio

---

[1] *See* C.A. No. 2017-0665-KSJM, Docket ("Dkt.") 167, Joint Schedule of Evid. Ex. A.

[2] The Factual Background cites to: Docket entries by docket number; trial exhibits by "JX" number; the trial transcript ("Trial Tr."), *see* Dkts. 150, 151; transcripts of the depositions ("Dep. Tr.") of Joseph Binder, TJ Rose, Brian Schroeder, and Geoffrey Wayne, *see* Dkts. 141, 146; and facts stipulated in the parties' Amended Joint Pre-trial Stipulation and Order ("PTO"), *see* Dkt. 147.

[3] PTO ¶ 5.

area.[4]  Parsons was the nominal head of Associates,[5] which employed the DermSA physicians.[6]  Non-party Robert Schubert, a Certified Public Accountant, was Parsons's "nuts and bolts" guy.[7]  Schubert ran Management,[8] which provided administrative business support services to Associates.[9]

Defendant Oliver Street Dermatology Management LLC ("Oliver Street") is a dermatology practice management organization.[10]  Oliver Street is what some might refer to as a "roll-up" company, or a company that is built through the acquisition of businesses that perform similar services.[11]  By 2013, Oliver Street had acquired sixty-five dermatology practices.[12]  Non-party Derm Growth Partners I, LLC ("Derm Growth") owns 100% of Oliver Street.[13]  Non-party ABRY Partners, LLC ("ABRY") owns a majority of the membership interests in Derm Growth.[14]

---

[4] *Id.* ¶¶ 7, 12.

[5] *See* Trial Tr. at 125 (Schubert explaining that Texas law requires that physicians "be employed by a company that is headed by a physician").

[6] *Id.* at 124 (Schubert).

[7] *Id.* at 238 (Parsons).

[8] *Id.* at 124 (Schubert).

[9] *Id.*

[10] *Id.* at 287–88 (Wayne).

[11] *Id.* at 288 (Wayne).

[12] *Id.*

[13] Wayne Dep. Tr. at 15; *see also* Rose Dep. Tr. at 13–14.

[14] Wayne Dep. Tr. at 17; *see also* Rose Dep. Tr. at 13–14.

## B. The Letter of Intent

Oliver Street first began exploring an acquisition of DermSA in 2013. Based on the number of physicians at that time, DermSA was in the top five percent of dermatology practices nationally and was the largest dermatology practice in Texas, where Oliver Street had a large presence.[15] DermSA, therefore, presented a unique acquisition opportunity for Oliver Street.

Oliver Street and DermSA discussed a potential transaction in 2013 and again in 2014, but they did not reach an agreement. Ultimately, there was too big a gap between DermSA's value expectations and the price Oliver Street was willing to pay.[16]

---

[15] JX-200 (9/18/13 email from Oliver Street CEO Geoff Wayne to his associates at Oliver Street and others describing his three-hour visit with Parsons and Schubert and stating that Oliver Street needs "to take a serious look at this one, it appears to be the largest practice in the state (by docs) and would be a great platform, easy to recruit to, etc."); *see also* Trial Tr. at 318–19; *id.* at 237 (Parsons testifying that DermSA was a unique practice); *id.* at 217 (Schubert testifying that DermSA was "in a special situation" and, in his view, Oliver Street needed them).

[16] Trial Tr. at 290 (Wayne); *see also* JX-17 (10/21/13 email from Wayne to Parsons copying Schubert and others attaching letter of intent to acquire DermSA for a sum certain); JX-340 (10/21/13 letter of intent); JX-18 (10/24/13 email from Wayne to Lawrence Anderson, a former associate of Parsons and previous owner of one of Oliver Street's earlier acquisitions, explaining that DermSA countered for a much higher EBITDA multiple); JX-19 (10/30/13 email from Wayne to Candescent Partners, Oliver Street's investor at the time, explaining the details of the counteroffer and saying: "They like us and really want to make something happen, but it is not going to be now. We agreed to stay in touch and see how things transpire."); JX-20 (10/31/13 email from Wayne to Schubert and Parsons offering to acquire DermSA at a fixed EBITDA multiple); JX-342 (12/16/13 letter from Wayne to Parsons setting forth revised indication of interest).

4

DermSA renewed discussions in November 2015, when Schubert informed Oliver Street's CEO, Geoff Wayne, that Parsons "would entertain an offer of $22.5 million."[17] The parties engaged in discussions about appropriate EBITDA multiples for the DermSA practice.[18] In December, Schubert sent Wayne DermSA's financial projections for 2016, which reflected a projected EBITDA of $2.7 million.[19] Based on review of DermSA's year-end 2015 financial results and projected 2016 EBITDA, Oliver Street made an offer to purchase DermSA at $23 million.[20]

Wayne had reservations about a $23 million purchase price, which "equate[d] to a multiple higher than the three largest practices in the country [had] recently sold for."[21] At the same time, however, the market was changing as more buyers similar to Oliver Street were entering the dermatology space.[22] With demand for dermatology practices up and supply limited, Oliver Street decided to put a premium

---

[17] JX-202 (11/13/15 email from Schubert to Wayne).

[18] JX-330 at 1 (11/17/15 email from Wayne to Schubert); *see also* Trial Tr. at 298 (Wayne testifying to his perspective: "The EBITDA was not as good as I think what they even thought it was, what DermSA -- or what it really was. And so it took a while, but I think it was at least helpful in all of us orienting about what the real numbers were."); *id.* at 299 (Wayne testifying that DermSA's "historic financial performance would in no way justify a $22 1/2 million number, because that's not what people pay for practices like that"); *id.* at 300 (Wayne testifying that a $22.5 million purchase price equated to a 20x EBITDA multiple based on DermSA's historic performance and a 12x EBITDA multiple based on DermSA's projected future performance, and that a 12x multiple was "just too high").

[19] JX-328 (12/22/15 email from Schubert to Wayne attaching financial projections).

[20] JX-327 (1/15/16 email from Wells to Parsons copying Wayne and Schubert).

[21] JX-205 at 1 (5/25/16 email from Wayne to Schubert and Parsons).

[22] Trial Tr. at 306 (Wayne).

offer on the table.  Oliver Street formalized this offer in a letter of intent, which the parties executed on January 29, 2016.[23]

### C.   Due Diligence

The letter of intent granted Oliver Street a forty-five day period of exclusivity to conduct due diligence.[24]  The parties executed four amendments to the letter of intent extending the exclusivity period through June 2, 2016.[25]  Through diligence, Oliver Street discovered information that led it to conclude that DermSA was a riskier acquisition than it previously believed.

Oliver Street's first wave of concerns emerged in March 2016.  Around March 11, 2016, Schubert sent Wayne DermSA's financial results for January and February 2016,[26] and those financials revealed that DermSA's actual revenues to date were about 12% less than projected.[27]  Wayne, Schubert, and Parsons met in person to discuss these concerns on March 23.  Wayne relayed Oliver Street's perspective that the financial review did not support an offer of $23 million, and he

---

[23] JX-25 at 2 (1/29/16 letter of intent).

[24] *Id.* at 5.

[25] JX-27 (3/9/16 first amendment extending exclusivity period through to 4/4/16); JX-29 (4/8/16 second amendment extending exclusivity period through to 4/29/16); JX-30 (4/29/16 third amendment extending exclusivity period through to 5/13/16); JX-33 (5/12/16 fourth amendment extending the exclusivity period through 6/2/16).

[26] JX-28 at 4 (3/11/16 email from Schubert to Wayne copying Wells).

[27] *Id.* (3/11/16 email from Wayne to Schubert copying Wells).

reduced Oliver Street's offer to $17 million.[28] In response, Parsons and Schubert terminated negotiations.[29]

Wayne then made a proposal that he hoped would bring DermSA back to the negotiating table. A few hours after the March 23 meeting, Wayne emailed Parsons stating that Oliver Street would pay Parsons his asking price of $23 million if DermSA agreed to four new terms, most of which were related to DermSA's lagging financial performance.[30] The new terms focused on adjusting physician compensation downwards, charging physicians for the cost of their products, examining other possible expenses that could be cut, and looking for other acquisition targets in the San Antonio market.[31] DermSA agreed to make the adjustments, and Schubert responded that he was "pleased to learn that things [were] back on track and that [Oliver Street was] willing to pay the $23 million for [DermSA]."[32]

Oliver Street's second wave of concerns emerged in May 2016. This wave involved two issues. The first issue was DermSA's facility leases. Oliver Street

---

[28] Trial Tr. at 140 (Schubert).

[29] *Id*.

[30] JX-203 at 1–2 (3/23/16 email from Wayne to Schubert and Parsons copying Wells).

[31] *Id.*

[32] *Id.* (3/23/16 email from Schubert to Wayne).

viewed the leases as "non-market"[33] because each lease lasted for a term of fifteen years and made the tenant responsible for HVAC and roof replacement.[34] The other issue was the DermSA physicians' employment agreements. DermSA employed sixteen physicians, not including Parsons. Of those physicians, fourteen were the company's primary revenue drivers.[35] The physicians' employment agreements contained an anti-assignment provision that automatically terminated the agreements upon the sale of DermSA.[36] Automatic termination of the employment agreements "could potentially be disastrous for any prospective purchaser"[37] in that it "essentially could leave [the purchaser] without a business."[38]

Oliver Street's Chief Development Officer, Scott Wells,[39] identified the two issues for Parsons and Schubert and proposed solutions for each.[40] As to the lease

---

[33] Trial Tr. at 304 (Wayne); *see also* JX-204 (5/17/16 email from Wells to Parsons and Schubert copying Wayne).

[34] JX-204 at 1 (5/17/16 email from Wells to Parsons and Schubert copying Wayne).

[35] Trial Tr. at 150–51 (Schubert explaining that DermSA employed sixteen physicians "besides Dr. Parsons" but that one physician was planning to retire and Oliver Street did not intend to retain another because she was a pathologist who was not profitable); *id.* at 320 (Wayne testifying that the physicians are "the revenue generators and the future of the company"); *see also id.* at 308, 312–14 (Wayne).

[36] *See, e.g.*, JX-7 (employment agreement for Alfred J. Hockley, III); JX-10 (employment agreement for Thushan N. DeSilva).

[37] JX-204 at 1 (5/17/16 email from Wells to Parsons and Schubert copying Wayne).

[38] Trial Tr. at 308 (Wayne).

[39] PTO ¶ 9.

[40] JX-204 at 1 (5/17/16 email from Wells to Parsons and Schubert copying Wayne).

8

agreements, Wells proposed that Parsons and Schubert allow Oliver Street to negotiate better terms.[41] As to the employment agreements, Oliver Street proposed that the physicians sign an amendment stating that they would continue to work for Oliver Street post-closing. The amendment would also include a longer period for noticing resignation, changes to the 401(k) plan, and new non-compete language that included a "non-compete buyout" equal to one year of a physician's compensation.[42]

Oliver Street's proposal does not appear to have been controversial as to the lease agreements, but the physician employment agreements seemed like a deal breaker. Schubert inquired whether *all* of the physicians would be required to execute an amendment to their employment agreement.[43] Wayne answered: "Yes, we must have *all* physicians sign the amendment."[44] With this message, negotiations appeared to hit a "roadblock."[45]

Wayne again made a proposal that he hoped would bring DermSA back to the negotiating table. On June 1, 2016, the day before the extended exclusivity window expired, Wayne sent a lengthy email to Parsons and Schubert. The email set forth a

---

[41] *Id.* (Wells stating: "We are happy to approach the landlord about amending the lease . . . .").

[42] *Id.*

[43] JX-205 at 1 (5/26/16 email from Schubert to Wayne copying Parsons).

[44] *Id.* (5/26/16 email from Wayne to Schubert copying Parsons (emphasis added)).

[45] JX-35 at 1 (6/1/16 email from Wayne to Parsons and Schubert copying Wells).

9

"review [of] how far" the parties had come as well as Wayne's view of "the realities of the situation."[46] Wayne emphasized the parties' history together and the trust they had built. Wayne reiterated his concerns about the size of the EBITDA multiple: "In your case, your 2015 EBITDA would only be worth $12-15mm to another buyer (10-12x) at the very high end. The two largest practices in the country recently sold at 14x (they each have more than 100 doctors and $30mm of EBITDA)."[47] He further reiterated his concerns about the employment agreement amendments given DermSA's underperformance.[48]

Wayne suggested two options for mitigating the risk of doctors not signing the employment agreement amendments. The first was the offer on the table—work toward a $23 million purchase price with *all* physicians executing amendments to their employment agreement.[49] The second was to require a minimum number of

---

[46] *Id.*

[47] *Id*.

[48] *Id.* (Wayne stating: "[W]e want you to understand that we are unable to move forward at the current price without all physicians signing off on the assignment of their contracts – doing so would not make sense for us, or any other buyer. This would leave any buyer with an enormous amount of risk and uncertainty, which does not merry up with paying a premium purchase price. Making this issue more critical to us is the EBITDA is below expectations, so we are being asked to pay more for less.").

[49] *Id.* (Wayne describing the first option: "Work towards a sign and close at $23mm purchase price. As such, we will require all physicians to sign the amendment allowing for the contracts to be assigned to us so they are valid and enforceable. Again, something anyone will require.").

10

physicians to execute the amendment and deduct a set amount from the purchase price for each physician who declined to do so. In Wayne's words:

> Create a structure where we require the signing of at least 12 of the 16 physicians, and for each physician that does not sign we will deduct $1 mm from purchase price. Essentially we are offering to take on additional risk under this scenario, but must receive a reduction in purchase price to account for doing so.[50]

Of these options, DermSA chose the second. On June 2, 2016, DermSA's deal counsel, Paige Castañeda of Winstead PC, responded to Oliver Street's deal counsel, John Pitfield at Choate Hall & Stewart LLP, so indicating.[51] She countered Oliver Street's proposed $1 million penalty per physician who did not sign with a penalty of no more than $400,000 per physician who did not sign.[52]

Wayne conferred internally regarding the negotiations with TJ Rose, a principal at ABRY,[53] and concluded that as a condition to closing, at least twelve of

---

[50] *Id.* at 1–2.

[51] JX-36 at 2–3 (6/2/16 email from Castañeda to Pitfield).

[52] *Id.*

[53] *Id.* at 2 (6/2/16 email from Rose to Wayne: "From a numbers perspective, we are significantly over-paying for this asset. And now we aren't even sure we'll have all of the doctors committed to our new platform. This has the potential to turn out to be a very bad deal for us. I would imagine that in past situations if a doctor or two left, we would feel ok given the purchase price paid. Also, I can imagine other sellers/owners haven't been as difficult as this seller. I believe I fully understand the strategic value of the asset but we seem to be moving farther and farther from what I thought were our key acquisition criteria.").

11

the fourteen physicians needed to sign the amendment.[54] Oliver Street rejected the demand to lower the per-physician penalty from $1 million to $400 thousand. Parsons later agreed to Wayne's terms. Under the new structure, Plaintiffs agreed to obtain amendments from twelve of the fourteen physicians at a cost of $1 million for any physician that did not sign.[55]

## D.    The APA

On July 1, 2016, DermSA, Parsons, Oliver Street, and Derm Growth entered into an asset purchase agreement (the "APA").[56] Under the APA, Oliver Street and Derm Growth agreed to acquire the DermSA business and Parsons's goodwill in the business for a total price of roughly $23 million.[57] The consideration comprised $20.7 million in cash in exchange for the business and $2.3 million in Derm Growth equity in exchange for Parsons's goodwill.[58] The latter aspect of the consideration was structured as a capital contribution by Parsons to Derm Growth.[59] The transaction was on a timeline to close not later than August 12, 2016.[60]

---

[54] *Id.* at 2–3.

[55] *See* JX-207 (6/10/16 email from Pitfield to Wayne and Wells).

[56] JX-46, APA.

[57] *Id.* § 1.5; *id.* at 118.

[58] *Id.* § 1.5; *id.* at 118.

[59] *Id.* at 118.

[60] *Id.* § 1.6(a).

Between signing on July 1, 2016, and the target closing date of August 12, 2016, Plaintiffs and Oliver Street attempted to convince the physicians to sign the employment agreement amendments.

On July 7, Wayne and Schubert met with the DermSA physicians to begin garnering support for the transaction.[61] During the meeting, two DermSA physicians expressed their discontent with the transaction, but Schubert remained optimistic that they would not cause a problem.[62]

On July 11, Wayne and Schubert again met with the DermSA physicians to discuss the transaction.[63] At that meeting, additional physicians voiced more specific concerns about non-compete provisions in the employment agreement amendments.[64] According to Schubert, the physicians were concerned that any non-compete provision in the agreement with Oliver Street would prevent the physicians from practicing within eight miles of any Oliver Street practice, not just the three DermSA branches.[65] Because Oliver Street managed dermatology practices across

---

[61] JX-47 (7/7/16 email from Wayne to Schubert and Parsons thanking them for the opportunity to meet with the physicians); Trial Tr. at 152 (Schubert); *id.* at 345–46 (Wayne).

[62] Trial Tr. at 152 (Schubert); *see also* JX-47 at 1 (7/7/16 email from Schubert to Wayne: "Dr. Parsons talked with the two ladies that I had some concerns with following the meeting. He believes they're fine and won't cause a problem.").

[63] Trial Tr. at 153 (Schubert).

[64] *Id.*

[65] *Id.*

the country, such a provision would hamper the physicians' professional mobility nationwide and not just in San Antonio.[66]

After the July 11 meeting, eleven physicians organized and consulted attorney Dana Remy, who sent Wayne a letter dated July 20, 2016.[67] The letter stated that the physicians would not execute the employment agreement amendments and that they instead sought "new employment agreements which [would] ensure their continued professional autonomy and productive work environment."[68] The letter also stated that Wayne should direct all communications regarding the physicians to Remy.[69] Wayne forwarded the communication to Parsons and Schubert with a cover email conveying both surprise and concern.[70] Remy later emailed Castañeda a letter listing the physicians' demands on July 26, 2016.[71] The demands were forwarded to Oliver Street.[72]

---

[66] *Id.*

[67] JX-55 at 2 (7/19/16 letter from Remy to Wayne); Trial Tr. at 346 (Wayne). Remy stated that she represented Mary Altmeyer, MD; Thushan DeSilva, MD; Chantal Barland DeVillena, MD; Alfred Hockley, MD; Rinna Johnson, MD; Karla Munoz, MD; Mobolaji Opeola, MD; Liliana Saap, MD; Dave Shriner, MD; Stephen Stahr, MD; and Lisa Walk, MD. JX-55 at 2–3.

[68] *Id.* at 2.

[69] *Id.*

[70] *Id.* at 1 (7/20/16 email from Wayne to Parsons and Schubert copying Wells and Pitfield).

[71] JX-56 at 3 (7/26/16 letter from Remy to Castañeda).

[72] *Id.* at 1 (7/16/16 email from Castañeda to Pitfield).

By the August 12, 2016 closing deadline under the APA, only four of the required twelve physicians had signed the employment agreement amendment.[73] The transaction did not close.

Oliver Street did not terminate the transaction under the APA. Instead, by letter dated August 12, Wayne informed Plaintiffs that Oliver Street was "reserving [its] right to terminate the [APA] because the closing condition set forth in Section 1.6(c)(ii) has not been satisfied by today."[74]

## E.     Continued Negotiations

Undefeated, the parties kept pushing toward an agreement, volleying back and forth various revised terms and frameworks intended to account for the risk of physician departures.

On September 19, 2016, Wayne proposed terms that shifted from a "penalty model" that penalized Plaintiffs for the failure of any doctors to sign the employment agreement amendment, to an "incentive" model designed to "create a reward for each doctor that does sign new contracts."[75] The new terms involved a $10 million

---

[73] JX-60 at 2 (Oliver Street's 8/12/16 notice of intent not to close and reservation of right to terminate the APA); Trial Tr. at 310 (Wayne).

[74] JX-60 at 2; *see also* Trial Tr. at 309–10 (Wayne).

[75] JX-65 at 3 (9/19/16 email from Wayne to Schubert copying others). In anticipation of the fact that the physicians would not execute the amendments, on August 4, 2016, Wayne had proposed a revised deal structure where Oliver Street would pay $11 million in cash up-front, $6 million in cash divided amongst the employee physicians, which would be required to be invested in Oliver Street, such that "each physician would have material ownership from the beginning, but they must stay to receive the value, and $6 million in a

15

up-front cash payment and an $8 million tiered bonus pool for signing the remaining eight physicians, with DermSA receiving $500,000 for the first four physicians and $1.5 million per any additional physicians.[76] The proposal also involved holding $1 million in escrow and $4 million in a pool of "bonuses/equity" for physicians who signed the employment agreement amendment.[77] Wayne concluded that if these terms were not acceptable, then Oliver Street would "need to terminate the agreement and focus [its] efforts elsewhere."[78]

At some point following the offer in September 2016, one of DermSA's physicians, Thushan DeSilva, resigned from DermSA.[79] DeSilva was a key revenue producer, and Oliver Street expressed disappointment and concern upon the news of his departure.[80]

---

three-year earnout payments to Parsons and Schubert, the final value dependent upon how many physicians are still working at the end of three years." JX-57 at 1 (8/4/16 email from Wayne to Parsons and Schubert). This September 19 offer built off those terms.

[76] JX-65 at 2–3 (9/19/16 email from Wayne to Schubert copying others); *see also* Trial Tr. at 314–16 (Wayne).

[77] JX-65 at 2–3 (9/19/16 email from Wayne to Schubert copying others).

[78] *Id.* at 3 (9/19/16 email from Wayne to Schubert copying others). DermSA declined this offer. *See* JX-66 at 2 (9/28/16 email from Castañeda: "That said, some modifications to Geoff's offer of September 19th will be required, and we trust you can consider the changes.").

[79] JX-66 at 1 (10/4/16 email from Pitfield to Castañeda copying others); Trial Tr. at 316–17 (Wayne).

[80] JX-66 at 1 (10/4/16 email from Pitfield to Castañeda copying others stating: "We are surprised and disappointed that Dr. DeSilva has chosen to leave the practice based on the communications to date regarding the likelihood of the doctors remaining with the practice.

16

DeSilva's departure caused Oliver Street to send a further revised proposal on October 4, 2016, reducing the maximum purchase price by $1 million to account for the "EBITDA impact" of DeSilva's departure.[81] Oliver Street offered "$9 million to be paid at closing, with an additional $400k per the first 5 doctors . . . who accept the [employment agreement] amendment, and $1.5 million per the final 4 doctors who accept the amendment."[82] Oliver Street requested that it be allowed to "bring the . . . proposal directly to the doctors."[83]

The next day, Schubert communicated his disappointment with Oliver Street's new position.[84] He stated that although he understood that DeSilva's departure "may have required a reduction in purchase price," Oliver Street's revisions were "a disproportionate response to Dr. DeSilva's leaving, and one that sets us back to square one as far as negotiations with the physicians."[85] Schubert concluded that he and Parsons were "willing to continue to negotiate a deal that would not require those physicians' signatures at closing" and that they "would accept a reasonable,

---

This impacts EBITDA materially and raises strong concern about what the remaining doctors will do.").

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] JX-67 at 1 (10/5/16 email from Schubert to Wayne copying others).

[85] *Id.*

appropriate reduction in purchase price for Dr. DeSilva's departure."[86]   If Oliver

Street could not agree to those terms, the parties would need to "part ways."[87]

Throughout this time period, Oliver Street had pushed to communicate

directly with the physicians.[88]   DermSA was initially resistant to the idea, stating in

August 2016 that a meeting was "premature."[89]   By September 2016, however,

DermSA agreed that Oliver Street should meet with the DermSA physicians directly

and without the presence of Parsons or Schubert, because "people are often reluctant

to speak openly . . . when their 'bosses' are present."[90]   A meeting was scheduled

for September 20, 2016,[91] but the physicians declined to attend.[92]   In his email

transmitting the October 4, 2016 revised proposal, Pitfield emphasized:  "We believe

---

[86] *Id.*

[87] *Id.*

[88] JX-65 at 4 (9/19/16 email from Schubert to Wayne copying Castañeda explaining DermSA's belief that "this group of doctors is hoping that you will perceive this roadblock as indicating a greater future risk than actually exists.  We are hoping that you will be able to see through their tactics.").

[89] JX-62 at 1 (8/24/16 email from Castañeda to Pitfield); *see also id.* (Castañeda stating that "DermSA feels that the best path to a successful transaction, from the buyer's, seller's and physician employees' perspective, is to be patient with the doctors and give them a few more days to get back to us with their new response.").

[90] JX-63 at 1 (9/15/16 email from Wayne to Schubert).

[91] *Id.*

[92] *See* JX-65 at 4 (9/19/16 email from Schubert to Wayne copying Castañeda and summarizing events of the prior week, including "the refusal of the group of physicians to talk with [Wayne]").

18

approaching the doctors through their lawyer is the only viable path at this point. We do not otherwise know how to assess the likelihood of doctor retention."[93]

By October 18, 2016, Oliver Street was "prepared to terminate the deal if [it couldn't] have the meeting."[94] Wayne further warned DermSA that its options were limited if Oliver Street walked away because at that point, any future terms would result in a far lower purchase price determined by DermSA's actual EBITDA, rather than the original projections used in the first deal whose terms were papered three months prior in July.[95] According to Wayne, this would "result in less than half" of the valuation sought by Parsons.[96]

Despite Wayne's warnings, Oliver Street offered to "forgo [sic] the meeting if [DermSA was] willing to accept a materially lower purchase price."[97] After some back and forth, Wayne suggested that the parties "have a face to face meeting to go over the proposal."[98] They met on October 27, 2016, and Wayne presented two

---

[93] JX-66 at 1 (10/4/16 email from Pitfield to Castañeda copying others).

[94] JX-68 at 2 (10/18/16 email from Wayne to Parsons and Schubert copying others). It appears that this email may have been sent earlier than October 18 but that Dr. Parsons did not respond until Wayne resent it and copied Castañeda and Schubert. *See id.* at 1 (Wayne writing: "Paige and Bob, please kindly relay the email below to Dr. Parsons in the case that he is not reading his emails with regularity.").

[95] *Id.* at 2 (10/18/16 email from Wayne to Parsons and Schubert copying others).

[96] *Id.*

[97] *Id.*

[98] JX-69 at 1 (10/24/16 email chain between Wayne, Parsons and Castañeda).

19

proposal structures: one involving an up-front cash payment, and one involving a delayed earn-out payment.[99]

Parsons preferred to have the cash up front. The day after Wayne presented him with a choice, Parsons proposed that he be paid a total of $17.7 million in up-front consideration, divided between $15.7 million in cash and $2 million in stock.[100] Wayne responded that Oliver Street would not go higher than $16 million on any up-front consideration.[101]

On October 31, 2016, Parsons accepted the $16 million up-front offer if it could be divided between $12 million in cash and $4 million in stock.[102] Wayne forwarded Parsons's acceptance to Pitfield and stated: "we are back on."[103] The parties worked to structure the new deal and paper its terms.

### F. The Amended APA

On December 21, 2016, the parties executed an Amended Asset Purchase Agreement (the "Amended APA").[104] Under the Amended APA, Oliver Street and

---

[99] *See* JX-70 at 1 (10/26/16 email from Wayne to ABRY stating that Wayne was meeting with DermSA on October 27); JX-74 at 1 (10/28/16 email from Schubert to Wayne regarding meeting that occurred on October 27).

[100] JX-74 at 1–2 (10/28/16 email from Schubert to Wayne).

[101] *Id.* at 1 (10/28/16 email from Wayne to Schubert).

[102] JX-75 at 1 (10/31/16 email from Schubert to Wayne copying Castañeda).

[103] *Id.* (10/31/16 email from Wayne to Pitfield copying others).

[104] PTO ¶ 16.

Derm Growth agreed to acquire the DermSA practice and Parsons's goodwill for a total of roughly $16 million.[105] The structure of this consideration differed slightly from the October 31 agreement in that it comprised $13 million in cash and $3 million in Derm Growth equity, the latter of which was structured as a capital contribution by Parsons to Derm Growth.[106] The Amended APA obligated the parties to "use commercially reasonable efforts to cause the Closing Date to be not earlier than January 10, 2017 and not later than January 31, 2017."[107]

### G.    The Termination Provision and Relevant Closing Conditions

Section 7.1(c) of the Amended APA granted Oliver Street the right to terminate, "[b]y notice given prior to or at the Closing," for two disjunctive reasons:

> [1] if any condition in Section 1.6 . . . has not been satisfied as of the Closing Date *or* [2] if satisfaction of such a condition by the Closing Date is or becomes impossible.[108]

Two conditions found in Section 1.6 are in dispute.

---

[105] JX-91, Amended APA § 1.6; *id.* at 122.

[106] *Id.* § 1.6; *id.* at 122; *see also* Trial Tr. at 323–24 (Wayne testifying on the difference in purchase price, from Oliver Street's perspective: "Well, the financial performance was nowhere near the projections that they had provided to us, so that was certainly party of it. Dr. DeSilva leaving and the general unrest in the physician base, . . . us being prohibited [from speaking] with the physicians, raised lots of questions in our mind. So it was a number of different factors."); *id.* at 323:10–16 (Wayne further elaborating that "the idea was we would take some of the . . . decreased purchase price amount, the $7 million delta, and that would then be [Oliver Street's] responsibility post-closing, to use some of those dollars to provide consideration to the physician base so that they would sign on").

[107] JX-91, Amended APA § 1.6(a).

[108] *Id.* § 7.1(c) (emphasis added).

### 1. Bring-down Certification of No Material Changes in the Business

The first disputed closing condition, found in Section 1.6(i), required that Parsons, DermSA, and Management deliver "[a]t the Closing" a "Bring-down Certificate" certifying that the "representations and warranties in [the Amended APA] shall be true and correct in all material respects as of the Closing Date."[109] This decision refers to Section 1.6(i) as the "Bring-down Provision." It states in full:

> All of [Parsons's], [Management's] and DermSA's representations and warranties in this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though made at and as of such date, except (i) those representations and warranties that address matters only as of a specified date, which shall be true and correct in all material respects as of that specified date; and (ii) those representations and warranties set forth in Section 3.5 (Capitalization) and those qualified as to materiality, Material Adverse Effect or a similar such term, which shall be true and correct in all respects as of the Closing Date.[110]

Wayne testified that the purpose of this provision was to provide "further confirmation that what [the parties] had agreed to, the key points of a business, are the same as what [Oliver Street] thought they were when we signed the agreement

---

[109] *Id.* § 1.6(i)(1).

[110] *Id.*

back in December."[111]  Castañeda testified on cross examination of her belief that this is generally the purpose of bring-down provisions.[112]

All of Plaintiffs' representations and warranties are found in Article 3 of the Amended APA.  In relevant part, Plaintiffs represented and warranted that no employees intended to terminate their employment with or service to Plaintiffs. Article 3, Section 3.16(c) provides as follows:

> Schedule 3.16(c) sets forth a complete list of all employees of, and consultants and contractors that provide services to, the Business (collectively, the "Business Employees") . . . . *To the knowledge of [Plaintiffs], no Business Employee intends to terminate his or her employment with or service to [Plaintiffs]*.[113]

The language of the preamble to Article 3 states that the representations and warranties were "true and correct *as of the date of [the Amended APA]*."[114]

### 2. Landlord Consents

The second disputed closing condition, found in Section 1.6(b)(i), required that "[a]t the Closing, [DermSA] shall deliver or cause to be delivered . . . the Consent to Assignment of Lease and Estoppel Certificates" from the Landlords "in the form attached" to the Amended APA (the "Landlord Consents").[115]

---

[111] Trial Tr. at 341 (Wayne).

[112] *Id.* at 52–53 (Castañeda).

[113] JX-91, Amended APA § 3.16(c) (emphasis added).

[114] *Id.* art. III, pmbl. (emphasis added).

[115] *Id.* § 1.6(b)(i).

23

## H.     Events Prior to Termination

As the parties worked towards closing on the contemplated transaction, they encountered new (and old) hurdles to consummation.

### 1.     DermSA experienced changes in the business.

After the parties signed the Amended APA, two physicians noticed their intent to resign from DermSA.  On December 30, 2016, Plaintiffs received notice from DermSA physician Liliana Saap that she would not be renewing her employment contract.[116]   Plaintiffs notified Oliver Street a few days later.[117]   Oliver Street requested Schubert meet with Saap regarding her decision, and Schubert provided Oliver Street a report of the meeting.[118]

On January 24, 2017, Plaintiffs received notice from DermSA physician Mobolaji Opeola that she would not be renewing her employment contract.[119] Plaintiffs notified Oliver Street the next day.[120]   Opeola's departure "raise[d]

---

[116] PTO ¶ 18; JX-101 at 1–2 (12/30/16 email from Saap to Parsons and Schubert).

[117] JX-104 (1/3/17 email from Schubert to Wayne copying Parsons).

[118] JX-107 (1/7/17 email from Schubert to Wayne copying Parsons and Castañeda).

[119] PTO ¶ 19; JX-115 (1/24/17 email from Opeola to Parsons and Schubert).

[120] JX-121 at 1 (1/25/17 email from Schubert to Wayne copying others).

eyebrows"[121] at Oliver Street because it placed "a lot of revenue at risk."[122] Schubert met with Opeola regarding her decision and provided a report to Oliver Street.[123]

### 2. Oliver Street started looking for an excuse to terminate the deal.

The resignation of the two physicians gave Oliver Street cold feet about the deal. On January 27, Wayne sought to better understand from Schubert the financial impact of the two departures.[124] He requested information concerning the collections of the departing doctors in 2016 and how many support staff positions

---

[121] JX-138 at 2 (1/27/17 email from Wayne to ABRY team copying Oliver Street CFO, David Hinton).

[122] JX-224 at 3 (1/28/17 email from Wayne to Schubert); *see* Trial Tr. at 242 (Parsons) ("Q. And what was Oliver Street's response to receiving notice that Dr. Saap and Dr. Opeola gave notice that they were not going to renew their employment agreement? A. They wanted to know the financial impact. They were concerned. They wanted to know the financial impact."); *id.* at 383 (Wayne on cross examination: "Q. So every doctor that leaves decreases the value of the company? Correct? A. Yes."); *see also id.* at 334 (Wayne on direct examination: "Well, you know, with two doctors leaving, giving notice, that's going to have a material financial impact to the business. . . . Despite what could have been done to sort of plug the gaps, it wouldn't have worked.").

[123] JX-125 at 1 (1/26/17 email from Schubert to Wayne copying others); *see also See* JX-138 at 2 (1/27/17 email from Wayne to Rose and others stating: "My plan for now is to wait and see how the [sic] assess the impact and see where we stand with the lease assignments, and make a call mid next week."); Trial Tr. at 162 (Schubert).

[124] After Opeola's resignation, Oliver Street requested a list of the non-renewal notice deadlines for the other DermSA physicians, JX-118 at 1 (1/25/17 email from Wayne to Schubert copying others), and Schubert provided them, JX-125 at 2 (1/26/17 email from Schubert to Wayne and others attaching schedules); *see also* Trial Tr. at 373–75 (Wayne testifying on cross examination: "[W]e wanted to understand their perspective on what the impact to the organization would be. How would they be able to mitigate the loss of [Opeola's] production?").

25

would be eliminated as a result of their departure.[125] Schubert responded that Saap's collections were $1,043,108 in 2016, despite not working for nine weeks due to a broken hand.[126] Opeola's collections were $1,351,095 in 2016.[127] Schubert could not quantify the corresponding reduction in support staff positions but claimed that the "lost revenue would be offset by other expenses besides salaries."[128] Schubert later added that he was "working on the financials" and hoped to have them completed by January 30.[129]

At trial it was established that for the year ending December 31, 2016, the DermSA business booked $21,923,097 in revenue.[130] Thus, Saap's 2016 collections accounted for approximately 5% of DermSA's total revenue, and Opeola's collections accounted for approximately 6%. Together, these two doctors thus accounted for approximately 11% of DermSA's total revenue in 2016. Plaintiffs' own expert testified that the projected loss of revenue caused by the departures of Saap and Opeola was "not minimal."[131]

---

[125] JX-224 at 3–4 (1/27/17 email from Wayne to Parsons and Schubert).

[126] *Id.* at 3 (1/27/17 email from Schubert to Wayne).

[127] *Id.*

[128] *Id.* at 4.

[129] *Id.* at 2.

[130] JX-103 (DermSA Consolidated Statement of Revenue, Expenses and Retained Earnings For the Year Ended December 31, 2016).

[131] Trial Tr. at 496 (Solomon); *see also id.* (Solomon agreeing that the impact of Saap's and Opeola's departures would be "substantial" and crediting Wayne's testimony in

After learning of the financial impact of the physicians' resignations, Oliver Street determined that it needed a "path out" of the Amended APA to position itself for renegotiations. Wayne emailed the ABRY team on January 27 with the following options:

> The purchase agreement we signed essentially gives us two paths to get out of the deal – 1) material change in the business or 2) lease assignments not received by 1/31. I could and may have to argue that two doctors leaving is material for the obvious reasons, although that could get messy. If we want to renegotiate or walk, the best scenario is for us not to get the lease assignments.[132]

Of the two options outlined by Wayne, the first was "messy" because it could threaten Oliver Street's financing for the deal, and Oliver Street wanted to "get the transaction back on track" after renegotiating its terms.[133] Oliver Street had secured financing for the transaction and had a "responsibility to [its] lenders . . . to make sure that they have all of the information they needed to lend the money and . . .

---

concluding that "the revenue was going to be impacted significantly"); *id.* at 497 (Solomon testifying: "Well, 'material' could have different meanings in different contexts. I'm talking about the economics. And I think that a couple million dollars of revenue is material to this business from the standpoint of value. Particularly if you're looking at it in the short-term, you know, the value going out just a few years. If you're looking at it over the course of 20, 30 years, it may not have much of an impact.").

[132] JX-128 (1/27/17 email from Wayne to ABRY team copying Hinton)

[133] Trial Tr. at 368–69 (Wayne); *see also* JX-242 (1/29/17 internal ABRY email chain regarding availability of financing if transaction did not close on February 1).

underwrite."[134] Information regarding the physician departures could dampen the lenders' willingness to underwrite the financing for the deal.

Terminating on the basis of the failure to obtain Landlord Consents would "simplify things" in Wayne's view.[135] After vetting possibilities,[136] one ABRY representative suggested on January 28 that "[o]ne option would be to have the deadline pass for receiving the leases to gain more leverage to force a conversation with the doctors."[137] This became Oliver Street's back-up plan in the event Oliver Street was unsuccessful in renegotiating the deal terms.

### 3. Plaintiffs were on track to deliver the Landlord Consents at the Closing.

The problem with Oliver Street's back-up plan to use the failure to obtain Landlord Consents as a basis for termination was that Plaintiffs were on track to timely obtain the Landlord Consents.

---

[134] Trial Tr. at 368 (Wayne).

[135] *Id.* at 409–10 (Wayne).

[136] An ABRY representative asked whether Oliver Street was "allowed to speak with the other MDs at DermSA." JX-138 at 2 (1/27/17 email from Christopher Ritchie of ABRY to Wayne). Wayne responded that Parsons and Schubert "repeatedly said absolutely no to us visiting with the doctors since the legal letter came last summer. We all agree completely with you that it would be great to talk to them. Just can't force it to happen in this situation. But will push." *Id.* (1/27/17 email from Wayne to Ritchie).

[137] *Id.* at 1 (1/28/17 email from Rose to Wayne and others); *see also* JX-139 at 1 (1/28/17 draft email of Hinton contemplating: "How long do we wait on the lease documents in order to use that as a reason for not closing?").

DermSA required Landlord Consents from two landlords: Inland Private Capital ("Inland") and General Growth Properties ("GGP").[138] Inland leased DermSA two offices and GGP leased DermSA the third.

Both landlords reviewed Oliver Street's financials as part of the approval process. Wells and Oliver Street's director of corporate development, Brent Ohlsen, ran point for Oliver Street in providing the landlords with information.

From November 2016 through mid-January 2017, Inland communicated directly with Oliver Street. Inland first requested financial information from Oliver Street, which Wells provided on November 16.[139] Inland forwarded the documents to its financial consultant.[140] Inland later requested additional information, which Ohlsen provided on December 6.[141] Ohlsen diligently followed-up a week later to see if Inland required more information.[142] Inland's consultant then requested additional items on December 28,[143] which Ohlsen provided the same day.[144]

---

[138] JX-91, Amended APA at 84.

[139] JX-81 at 3 (11/16/16 email from Wells to Inland).

[140] *Id.* at 2 (11/16/16 email from Inland to Wells and Schubert copying others).

[141] JX-83 at 1–2 (12/6/16 email from Ohlsen to Inland copying others).

[142] JX-86 at 1 (12/14/16 email from Ohlsen to Inland copying others).

[143] JX-99 at 1 (12/28/16 email from Ohlsen to Inland's consultant copying others).

[144] *Id.* at 1–2 (12/28/16 email from Ohlsen to Inland's consultant copying others). Oliver Street's Chief Financial Officer David Hinton, PTO ¶ 9, confirmed that he had personally taken care of the outstanding issue, and he added: "[H]opefully we are done," JX-100 at 1 (12/29/16 email from Hinton to Ohlsen copying Wells).

After additional exchanges between Inland and Oliver Street in January 2017,[145] Inland sent the parties its "proposed Consent to Assignment of Lease"[146] on January 25. The consent did not match the form of consent attached to the Amended APA,[147] but Oliver Street's counsel approved the revised form via email, stating: "I'm fine with this."[148]

After Oliver Street approved the form of consent, Castañeda emailed Inland on January 26 to confirm that Inland would release DermSA from its obligations under the lease after it was assigned to Oliver Street.[149] Inland and Castañeda worked through a few additional revisions concerning a release of liability for DermSA.[150]

As of January 27, 2017, the Inland Landlord Consents were in execution form, except that Inland circulated a revised draft of its consent and noted that the landlord signature block had been revised to reflect the correct landlord entity on

---

[145] JX-109 at 3 (1/12/17 email from Wells to Inland copying others); *id.* at 2 (1/12/17 email from Inland confirming that it had received the financial analysis from its consultant and that "the ball [was] in Inland's court.").

[146] JX-119 at 1 (1/25/17 email from Inland to Pitfield and others attaching Inland's proposed consent).

[147] *Compare* JX-119 at 12, 15, *with* JX-91, Amended APA at 123–129.

[148] JX-119 at 1 (1/25/17 email from Pitfield to Castañeda copying others).

[149] JX-126 at 1 (1/26/17 email from Castañeda to Inland copying Wayne, Pitfield, and others).

[150] JX-131 at 1–2 (1/27/17 email chain between Castañeda and Inland, copying others).

February 1.[151]  While Oliver Street argues in this litigation that this proves that the Inland Landlord Consents were not finalized on time, this was a detail that could have been easily and quickly ironed out.

GGP also started its review process in November 2016.[152]  Although Wells did not respond immediately to GGP's initial email,[153] which gave Schubert some concern that consent would not be ready in time,[154] the record reflects that Wells attentively followed up with GGP throughout December 2016.[155]  One hiccup did emerge when GGP requested to add one of Oliver Street's related entities to the lease agreement.  After some back and forth, Oliver Street agreed to GGP's request to add

---

[151] JX-151 at 1 (2/1/17 email from Inland to Castañeda copying Wayne and others); *see* JX-131 at 1 (1/27/17 email from Castañeda to Inland, Pitfield, and others: "If you and John Pitfield can please confirm that these are final, then John or I can circulate the execution copies early next week"); JX-132 at 1 (1/27/17 email from Inland to Castañeda, Pitfield, and others confirming that "[t]he changes look fine" in response to Castañeda's email in JX-131).  After agreeing to a form of consent, Inland attempted to negotiate a side agreement with Oliver Street concerning the information Oliver Street would report.  There was one email exchange in February.  *See* JX-157 (2/3/17 email chain between Inland, Castañeda, and others). On February 3, Inland circulated a proposed "side letter" agreement between Inland and Oliver Street.  JX-157 at 13.  Inland's representative testified at his deposition that the side letter did not affect Inland's "decision to move forward" and confirmed that Inland remained "willing and able" to sign the consent.  Binder Dep. Tr. at 86–87.

[152] *See* JX-88 at 1 (12/16/16 email from Schubert to Wayne and others stating that GGP had reached out to Wells on 11/29/16 and that Wells failed to respond).

[153] *See id.*

[154] *Id.*

[155] JX-89 at 2 (12/19/16 email from Wells to GGP attaching financial statements for Oliver Street Holdings LLC and seeking clarification concerning GGP's questions).

31

the entity to the lease as a guarantor.[156] GGP referred the consent to its "lease committee" and estimated that the assignment documents would be ready for execution at the end of January.[157] Oliver Street requested that the process be expedited due to the expected late-January closing.[158]

GGP reported on January 16, 2017, that its committee approved the lease assignment and that the assignment documents would be ready in five business days.[159] On January 31, GGP circulated revised versions of GGP's lease assignment and instructed DermSA to mail three executed copies to GGP's office in Illinois for GGP's signature.[160]

---

[156] In December, GGP stated that it required financial information for the signatory to the lease assignment, Oliver Street Management LLC, whose financial statements were rolled up into those of Oliver Street *Holdings*, LLC. JX-89 at 2 (12/19/16 email from GGP to Wells). When that proved impractical, GGP asked that Holdings appear on the lease as the tenant or a guarantor, and Oliver Street agreed to add Holdings to the lease as a guarantor. JX-93 at 2 (12/21/16 email from Wells to Schubert, GGP, and others).

[157] JX-93 at 1–2 (12/21/16 email from GGP to Schubert and Wells, copying others).

[158] JX-95 at 1–2 (12/21/16 email from Wells to Inland and Schubert, copying others).

[159] JX-110 at 1 (1/16/16 email from GGP to Wells copying others); *see also* JX-108 (1/12/17 email chain between Wells and GGP where GGP informs Wells that it would need to present the proposed assignment to its "lease committee," and Wells follows up a week later to learn that the lease committee meeting had been rescheduled for January 16); JX-120 at 1–2 (1/25/17 email chain among Wells and GGP confirming that Wells should receive a draft of the consent by January 26).

[160] JX-147 at 1 (1/31/17 email from GGP to Castañeda copying Pitfield and others requesting that Castañeda "1. Print three (3) copies of the PDF on legal size papers; 2. Sign and witness (where applicable); and 3. Mail all three Tenant-executed copies to my attention at the address below [in Chicago]").

Therefore, as of late January 2017, both landlords were ready to execute the consents. Castañeda testified that the Landlord Consents were finalized as of the morning of January 31,[161] and even Wayne could not have been surprised at this fact. In an earlier internal email, he documented his expectation that both Landlord Consents would be ready on January 30 or January 31.[162] Thus, it is possible (indeed, it is likely) that the consents would have been executed had the parties moved to Closing.[163]

### 4. Oliver Street decided to treat January 31 as the deadline for satisfying the closing conditions.

One way to cause DermSA to miss the deadline for delivering the Landlord Consents was to move the deadline forward. Convenient for Oliver Street, at the time Oliver Street was searching for a basis to terminate the Amended APA, there was confusion concerning the Closing Date.

---

[161] Trial Tr. at 38 (Castañeda); JX-144 at 3 (1/31/17 email from Castañeda to Pitfield stating that "as of this morning, the last of the three landlord consents was finalized"); *see also* JX-146 at 1 (1/31/17 email from GGP to Castañeda copying Pitfield and others attaching execution versions of GGP consents); JX-147 at 1 (same); JX-148 at 1 (same).

[162] JX-139 at 2 (1/28/17 email from Wayne to Rose copying others)

[163] Binder Dep. Tr. at 57 ("Q. As of January 31st, was Inland ready, willing and able to consent to the assignment of the lease? A. Yes. . . . I don't have the sequence of dates from recollection, but based on this review and knowing at one point we were signed off and ready to move forward, I would agree with that statement, yes."); Schroeder Dep. Tr. at 57 ("Q. So as of January 16th, 2017, the lease committee had approved the assignment? A. That is correct.").

The Amended APA does not set a Closing Date. Rather, it contemplates that the parties would "mutually agree" upon a Closing Date. The relevant provision states that performance "shall take place at a closing (the 'Closing'), effective as of 12:01 a.m. EST . . . on a date to be *mutually agreed* by the parties (the 'Closing Date')."[164] The Amended APA further obligated the parties to "use commercially reasonable efforts to cause the Closing Date to be not earlier than January 10, 2017 and not later than January 31, 2017."[165]

As of January 19, 2017, the parties had not yet agreed upon a Closing Date, but the circumstances made it clear that they were targeting a closing no earlier than the end of January.[166]

An end-of-month Closing Date was problematic because it risked leaving the DermSA employees without health insurance for the succeeding month. For this reason, on January 23, 2017, Wayne emailed Schubert to ask that the Closing Date be set for Wednesday, February 1.[167] Wayne explained that a February 1 closing date "would allow for a clean cut from January . . . and more importantly, give us

---

[164] JX-91, Amended APA § 1.6(a) (emphasis added).

[165] *Id.*

[166] JX-141 at 1–2 (1/19/17 email from Castañeda noting that the parties had not yet "determined a closing date").

[167] JX-118 at 3–4 (1/23/17 email from Wayne to Schubert and others).

the entire month of February to meet with your employees and get them onto our benefit plans."[168]

DermSA was resistant to further delay. Schubert responded to Wayne's request stating that DermSA "would like to close as soon as possible" and asked if they could close on January 31.[169] Schubert proposed, however, that the parties go ahead and amend the Amended APA to give them a little "wiggle room final deadline of Feb 3."[170]

Wayne responded by suggesting that the parties make February 1 the effective date, writing:

> We will need to make effective Feb 1 at 12.01am, if we do it Jan 31 then your employees [sic] health insurance will cancel immediately as this apparently happens at the end of a calendar month. Making the closing effective 2/1 gives us the entire month of Feb to go over benefit plan options with the employees and get them signed up.[171]

Schubert initially assented to Wayne's request on January 24, emailing: "2/1 at 12:01 rather than 1/31 at 11:59 is ok with [Plaintiffs]."[172] Then, eight minutes later, he withdrew that acceptance, explaining: "I was preparing this email to you

---

[168] *Id.* at 3 (1/23/17 email from Wayne to Schubert and others); *see also* JX-121 at 1–2 (1/25/17 email from Wayne to Schubert and others); Trial Tr. at 326 (Wayne).

[169] JX-122 at 2 (1/23/17 email from Schubert to Wayne and others).

[170] *Id.*

[171] *Id.* at 1 (1/24/17 email from Wayne to Schubert, Pitfield, and others).

[172] JX-121 at 1 (1/25/17 email from Schubert to Wayne, Parsons, and others).

that was sent by error rather than saving it. It has not been approved by Dr. Parsons or edited or completed. I will complete the email after lunch and get input from Dr. Parsons and send again.mail [sic] after lunch."[173] At trial, Schubert testified that he ultimately resent this email, but it became clear that he was mistaken.[174] Schubert never resent the email, and DermSA never expressed consent to a February 1 effective date.

Based on Wayne's January 24 email, Oliver Street's position in this litigation is that the parties only ever intended a February 1 effective date and that the Closing Date was always set for January 31.[175]

There are two problems with Oliver Street's litigation position. The first is that the Amended APA did not default to a January 31 Closing Date, as Oliver Street's position seems to require. The Amended APA required the parties to "mutually agree" upon a Closing Date. There is no evidence that Oliver Street agreed to Schubert's January 24 proposal to close on January 31. In fact, it is not entirely clear that Schubert's email was intended to be a firm offer, given Schubert's

---

[173] *Id.* (1/25/17 email from Schubert to Wayne, Parsons, and Castañeda).

[174] Trial Tr. at 163–64 (Schubert); *id.* at 276–86 (Wayne). The Court offered Plaintiffs the opportunity to address this factual dispute by re-calling Schubert. *Id.* at 286. Plaintiffs did not take up the offer.

[175] Dkt. 160, Def.'s Post-trial Br. at 27 ("[E]ven if Plaintiffs had accepted Wayne's counterproposal, it was to extend only the Effective Time of the transaction—not the Closing Date itself.").

additional proposal that the parties give themselves "wiggle room" until February 3.[176]

The second problem with Oliver Street's litigation position is that contemporaneous communications contradict it. Internal communications reflect that Oliver Street was working toward a Closing Date of February 1. On January 22, Wayne emailed deal counsel and others stating that the parties were "tentatively targeting" a closing date of February 1.[177] On January 24, Oliver Street's lender emailed seeking confirmation that "closing date of DermSA is now 2/1," and an ABRY representative responded "[t]hat's right."[178] On January 27, Wayne emailed Rose that they "still have a 2/1 close date in sight."[179]

Deal counsel was also working toward a Closing Date of February 1 or later. At trial, Castañeda testified that the parties were "hoping to close on February 1st,

---

[176] JX-122 at 2 (1/23/17 email from Schubert to Wayne and others).

[177] JX-113 at 1 (1/22/17 email exchange among Wells, Wayne, and Pitfield, with Wells stating that they were "tentatively targeting" a closing date of February 1); *see also* Trial Tr. at 398 (Wayne confirming that JX-113 implied a February 1 closing date).

[178] JX-256 (1/24/17 email exchange among Oliver Street's lender and ABRY representatives); *see also* JX-240 (1/24/17 email from Hinton to Ohlsen requesting "expected debt payoffs as of 2/1").

[179] JX-128 (1/27/17 email from Wayne to Rose and others); *see also* JX-223 (1/27/17 email from Hinton to Wells, Olsen, and Wayne asking: "[S]hould we still target 2/1 or something later [for DermSA]?"); JX-139 at 1 (1/28/17 draft email of Hinton theorizing that lease consents would be ready, which would "then put the burden back on [Oliver Street] to execute to allow for 2/1 closing").

but . . . it could have been February 2nd or 3rd."[180]  This testimony squares with the contemporaneous evidence.

In a January 25 email to Pitfield, Castañeda wrote:  "Just a reminder about the bonus amounts.  *If indeed we can close on February 1st*, the [Amended] APA requires that information to be provided within 7 days prior to closing, which is today [January 25]."[181]  Pitfield thanked her, said simply that DermSA was "pulling this together," and did not comment concerning the February 1 closing date.[182]

Again on January 27, deal counsel exchanged emails reflecting their assumption that the deal would close on February 1.  Castañeda emailed Pitfield and others: "I understand it would be effective February 1st, but when would wires go out?  We are going to request updated payoff letters from Plains Capital, so I wanted to know whether to ask for 1.31 or Feb 1."[183]  Pitfield responded:  "Will confirm with [Hinton] on [January 30] but plan would be for wires to go *on Feb 1 when we close*."[184]

---

[180] Trial Tr. at 30 (Castañeda).

[181] JX-116 at 1 (1/25/17 email from Castañeda to Pitfield copying others) (emphasis added).

[182] *Id.* (1/25/17 email from Pitfield to Castañeda copying others).

[183] JX-136 at 1 (1/27/17 email from Castañeda to Pitfield and others).

[184] *Id.* (1/27/17 email from Pitfield to Castañeda and others) (emphasis added).

On January 30, Castañeda told GGP that the parties "anticipate[d] *closing February 1st.*"[185]  She also wrote to Pitfield that she anticipated amending the APA to reflect a later closing date.[186]  The amendment memorializing a later date never occurred.  Oliver Street did not respond to Castañeda's January 30 email concerning the amendment or otherwise state that it now viewed the Closing Date as January 31.

The fact is that there was no mutual agreement to any Closing Date—January 31 or otherwise.  Rather, late in the game, Oliver Street's principals secretly decided to *treat* January 31 as the Closing Date because they knew that DermSA would not push to secure the closing deliverables by January 31.  They hoped this would "simplify things" by supplying an excuse to terminate and a platform to renegotiate.[187]

## I.     The Notice of Termination

Oliver Street's efforts to renegotiate the Amended APA on the basis of the physicians' departures proved unsuccessful.

On January 30, Oliver Street requested a conference call with DermSA.  Pitfield wrote that the purpose was to obtain "more information regarding how to

---

[185] JX-142 at 1 (1/30/17 email from Castañeda to GGP copying others) (emphasis added).

[186] JX-141 at 1 (1/30/17 email from Castañeda to Pitfield and others).  Somewhat confusingly, in this email, Castañeda wrote:  "anticipate a Second Amendment to APA to reflect the extension of closing *drop dead date*."  *Id.* (emphasis added).  The Amended APA, however, did not contain a "drop dead date."  At trial, Castañeda testified that she was referring to the January 31, 2017 date.  Trial Tr. at 30 (Castañeda).

[187] Trial Tr. at 409–10 (Wayne).

handle the two departing doctors post-closing,"[188] but the real purpose of the call was for Oliver Street to demand new terms. The call took place on the morning of January 31. Oliver Street requested that Plaintiffs assume additional risk by making Parsons's equity consideration contingent on DermSA physicians signing employment agreement amendments.[189]

DermSA rejected Oliver Street's proposal. After the call, Parsons and Schubert informed Castañeda that they were not interested in renegotiating any of the financial terms of the deal and that Parsons would not schedule a meeting between Oliver Street and the physicians until the transaction closed.[190] To them, the Amended APA did not require "[t]hat a minimum number of physicians come along at closing."[191] Because Oliver Street had abandoned this term and instead

---

[188] JX-224 at 1–2 (1/30/17 email from Pitfield to Castañeda and others).

[189] Trial Tr. at 32–33 (Castañeda); *see also* JX-160 at 1 (2/6/17 email from Wayne to Hinton and others explaining that DermSA "came back today and tried to negotiate off of our last 'offer' which was given the deterioration in the practice, Parsons needs to put 2mm of his equity rollover at risk tied to doctors signing on with us").

[190] Trial Tr. at 34 (Castañeda).

[191] JX-144 at 3 (1/31/17 email from Castañeda to Pitfield). *Compare* JX-46, APA § 1.6(c)(ii) (closing condition requiring employment agreement amendment to be executed by twelve physicians), *with* JX-91, Amended APA § 1.6(c)(ii), Sch. 1.6(c)(ii) (closing condition requiring employment agreement amendment to be executed by only five physicians who had already signed).

chosen to reduce the purchase price by $7 million, Plaintiffs believed that Oliver Street bore the risk that not all of the physicians would continue their employment.[192]

Castañeda relayed Schubert and Parsons's position to Pitfield and prepared to close on the transaction.[193] At 10:37 a.m. on January 31, her associate emailed Oliver Street's counsel and asked whether Oliver Street's counsel would be "circulating execution copies of the documents to be delivered at closing."[194] No one responded on behalf of Oliver Street.[195]

Oliver Street did not respond to Castañeda's email clarifying the Closing Date. By that time, Wayne had made the final decision to go to Oliver Street's back-up plan and terminate the Amended APA.[196] Wayne wrote that night to ABRY representative Rose: "[DermSA] refused to accept the adjusted terms and also will

---

[192] JX-144 at 2–3 (1/31/17 email from Castañeda to Pitfield); *see also* Trial Tr. at 37–38 (Castañeda testifying that "Oliver Street had requested on that conference call financial concessions. I think they had asked Dr. Parsons to make a portion of his equity consideration, the $3 million in shares, they had asked him to make a portion of that contingent on physicians remaining after the closing, something like that. So . . . this email was a reminder to John Pitfield from me that we had already made the financial concessions. Between the original asset purchase agreement and the revised asset purchase agreement, we had reduced the purchase price by $7 million to account with uncertainty among the physicians . . . . So Dr. Parsons was not interested in further financial concessions.").

[193] Trial Tr. at 33–34 (Castañeda); JX-144 at 2–3 (1/31/17 email from Castañeda to Pitfield).

[194] JX-225 (1/31/17 email from Castañeda's associate to Pitfield's associate asking if Oliver Street would be "circulating execution copies of the documents to be delivered at closing").

[195] Trial Tr. at 39 (Castañeda).

[196] *Id.* at 341–42 (Wayne).

not schedule a doctor meeting. Beyond crazy. We will terminate and let them know we are serious and likely talk to them in the morning."[197]

Oliver Street emailed a termination notice to Plaintiffs just after 5 a.m. the next morning, February 1, 2017.[198] At trial, witnesses for Plaintiffs testified that they were surprised to wake up to the termination notice. Castañeda testified that Plaintiffs and their counsel were "completely shocked."[199] Schubert suffered a debilitating heart attack that day, which he attributes to the stress of the termination.[200]

The notice of termination did not provide a basis for termination.[201] The notice stated only that Oliver Street was electing to terminate "pursuant to Section 7.1."[202]

On February 1, Wayne instructed Oliver Street's CFO: "Any communications with [the lender] about this needs to be [that] termination was because we reached

---

[197] JX-145 (1/31/17 email from Wayne to Rose).

[198] JX-152 (2/1/17 5:25 a.m. email from Pitfield to Parsons, Schubert, and Castañeda copying others transmitting Oliver Street's notice of termination).

[199] Trial Tr. at 40 (Castañeda).

[200] *Id.* at 165 (Schubert).

[201] *See* JX-152 at 2 (Notice of Termination).

[202] *Id.*

the outside date and lease assignments were not received. Let's not mention other issues, and we hope we can get this back on track."[203]

Oliver Street stuck to this narrative when communicating with DermSA. On February 2, Plaintiffs communicated through Castañeda their belief that termination was wrongful and that they were entitled to immediate performance.[204] In response, Oliver Street stated that Plaintiffs did not "satisfy contractually-required conditions . . . including but not limited to, by failing to obtain the required landlord consents."[205] Oliver Street further stated its position that the "Closing Date was never extended beyond January 31, 2017" because there was no writing signed by the parties evidencing such an amendment.[206]

In reality, the failure to obtain the Landlord Consents by January 31 was pretext, as Wayne confirmed in a February 2 email to ABRY:

> Short story – [DermSA] did not have the landlord consents in hand by end of day on Jan 31, which was a condition to close. We used this failure to terminate yesterday morning. *We did this because of the loss of the doctor last week and the owners* [sic] *subsequent unwillingness to share some risk and schedule the doctor meeting*, all of which were new asks based on the doctor leaving (just

---

[203] JX-149 (2/1/17 email from Wayne to Hinton).

[204] JX-154 at 2 (2/2/17 letter from Plaintiffs' litigation counsel, James Ruiz, to Wayne and Wells).

[205] JX-155 at 2 (2/3/17 letter from G. Mark Edgarton of Choate, Hall & Stewart LLP to Ruiz and Castañeda, copying others).

[206] *Id.*

want to have more insight into how the doctor base is thinking about things).[207]

## J.     This Litigation

At the time of termination, Oliver Street intended on continuing negotiations with DermSA toward a potential new deal.[208]  From February through April of 2017, the parties continued to push for a transaction and amicable resolution.[209]  Those efforts failed.[210]

Plaintiffs commenced litigation on September 15, 2017.[211]  Plaintiffs initially asserted two causes of action:  Count I for breach of contract and Count II for tortious

---

[207] JX-153 at 1 (2/2/17 email from Wayne to Rose and others at ABRY) (emphasis added); *see also id.* (2/2/17 email from ABRY representative to Wayne and others expressing continued interest in a deal:  "Is there a path to buying [DermSA] if we tell [Parsons] we are happy to do so if we are able to meet with the MDs and sign them up to cash/equity packages?"); *id.* (2/2/17 email from Wayne to Rose and others at ABRY:  "Certainly there is that path, but only if the owner will agree and frankly, he is behaving erratically. Ultimately he will have to agree to whatever we do.  We would still like to find a way, but given the background and issues we truly are the only buyer.").

[208] *See* JX-138 at 1 (1/28/17 email from Rose to Wayne and others positing:  "One option would be to have the deadline pass for receiving the leases to gain more leverage to force a conversation with the doctors."); JX-149 (2/1/17 email from Wayne to Hinton advising: "Any communication with [lender] about this needs to be termination was because we reached the outside date and lease assignments were not received.  Let's not mention other issues, and we hope we can get this back on track.").

[209] *See* JX-158 at 2–3 (2/7/17 letter from Castañeda to Pitfield); JX-227 (2/20/17 email from Wayne to Parsons and Schubert); JX-231 (2/28/17 email from Schubert to Wayne); JX-167 at 1–2 (4/19/17 email from Wayne to Parsons and Schubert, copying Pitfield).

[210] JX-232 (4/24/17 email from Castañeda to Pitfield and others rejecting Wayne's final proposal and stating that Plaintiffs would take "such actions as they deem necessary to protect their rights and interests . . . under the [Amended APA], including, without limitation, suit for breach of contract, specific performance and monetary damages").

[211] Dkt. 1, Pls.' Verified Compl. ("Compl.").

interference with prospective business relations.[212] The parties later stipulated to dismiss the claim for tortious interference.[213] Trial concerned Plaintiffs' Count I for breach of contract.

## II.   LEGAL ANALYSIS

There are three elements of a claim for breach of contract: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[214]

In the Complaint, Plaintiffs claim that Oliver Street breached the Amended APA "by failing to close the sale on January 31, 2017, and by delivering an

---

[212] *Id.* ¶¶ 27–35.

[213] Dkt. 15, Stipulation & Order of Dismissal of Count II of Pls.' Verified Compl.

[214] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *see also Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016). Each side denies that it bears the burden of proof. PTO at 5, 8. Neither side cites in briefing to legal authorities for its position. Typically, a party asserting a claim for breach of contract—here, Plaintiffs—bears the burden of proving each of the elements by a preponderance of the evidence. *Triple H Family Ltd. P'ship v. Neal*, 2018 WL 3650242, at *17 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019). Multiple decisions of this Court, however, have held that the terminating party—here, Oliver Street—"bears the burden of 'proving by a preponderance of the evidence the facts supporting the exercise of its termination rights.'" *Channel Medsys. v. Boston Sci. Corp.*, 2019 WL 6896462, at *16 (Del. Ch. Dec. 18, 2019) (quoting *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *4 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018)); *see also Akorn*, 2018 WL 4719347, at *47 & n.523 (collecting cases). In the end, as the Delaware Supreme Court has observed, the burden allocation only plays a role where the evidence is equipoise, which occurs in "very few cases." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242 (Del. 2012). In this case, the evidence is not equipoise, and thus the burden allocation is irrelevant.

ineffective Notice of Termination on February 1, 2017."[215] In briefing, Plaintiffs slightly reformulate their claim as one for repudiation, which is basically another word for wrongful termination.[216]

Under either formulation, Plaintiffs' claim centers on whether Oliver Street complied with the termination requirements of Section 7.1 of the Amended APA. Section 7.1 requires that notice of termination be timely, providing that "notice [be] given prior to or at the Closing."[217] Section 7.1 also limits the grounds on which Oliver Street may terminate to circumstances where "any condition in Section 1.6 . . . has not been satisfied as of the Closing Date *or* if satisfaction of such a condition by the Closing Date is or becomes impossible."[218]

Plaintiffs contend that Oliver Street's termination was not timely because Oliver Street failed to provide notice prior to the relevant deadline, which Plaintiffs identify as January 31. Plaintiffs further argue that there were no grounds for

---

[215] Compl. ¶ 30.

[216] Dkt. 155, Pls.' Post-trial Opening Br. at 38 (arguing that Oliver Street's "purported termination and subsequent refusal to perform constitute a repudiation of the [Amended APA]"); *see HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *14 (Del. Ch. May 2, 2007) (explaining that "repudiation of a contract is an outright refusal by a party to perform a contract or its conditions" and that a "party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty" (internal quotation marks and citations omitted)).

[217] JX-91, Amended APA § 7.1.

[218] *Id.* § 7.1(c) (emphasis added).

termination because all closing conditions were or could have been satisfied prior to or at the Closing.

Oliver Street responds that its termination was timely and proper. Oliver Street argues that the deadline for providing notice of termination was the "Closing," which never occurred. By contrast, Oliver Street contends that the deadline for satisfying closing conditions was the Closing Date, which it says was January 31. Oliver Street further contends that Plaintiffs failed to timely satisfy the closing conditions. At the time of termination, Oliver Street cited as the basis for termination Plaintiffs' failure to supply the Landlord Consents by January 31. In litigation, Oliver Street additionally argues that termination was appropriate because it would have been impossible for Plaintiffs to meet certain closing conditions, including the Bring-down Provision.

This decision first grapples with the parties' competing positions concerning the relevant deadlines for giving notice of termination and meeting the closing conditions. This decision then analyzes whether the closing conditions supply a basis for termination.

### A.    The Deadlines

Each side of this dispute seeks to establish a deadline contemplated by the Amended APA. Plaintiffs seek to enforce the deadline for giving notice of termination under Section 7.1 for the purpose of arguing that Oliver Street

47

"relinquished" its termination right by not meeting that deadline.[219]  Oliver Street seeks to firm-down the deadline for satisfying closing conditions under Section 1.6 for the purpose of arguing that Plaintiffs' failure to timely satisfy certain conditions constituted a basis for termination.

The irony of the parties' positions is that the two deadlines at issue are one in the same under the plain language of the Amended APA.  Section 7.1 of the Amended APA required Oliver Street to deliver notice of termination "prior to or at the Closing,"[220] language that forecloses a party from electing to close over a breach and then seeking to unwind after.[221]  Section 1.6 requires that each of the relevant closing conditions be satisfied "[a]t the Closing."[222]  Thus, the "Closing" is the latest date for both providing notice of termination and satisfying the closing conditions.

---

[219] Pls.' Post-trial Opening Br. at 29–32; Dkt. 162, Pls.' Post-trial Reply Br. at 3–5.

[220] JX-91, Amended APA § 7.1.

[221] Dkt. 168, Telephonic Post-trial Oral Arg. ("Post-trial Oral Arg. Tr.") at 36–37.  This language aligns the contractual scheme with principles of common law. *See, e.g.*, 14 *Williston on Contracts* § 43:15 (4th ed. 2020) (observing restrictions on an injured party's ability to unwind a transaction after closing); 2 *Farnsworth on Contracts* § 8.20, at 8-166 to 67 (4th ed. Supp. 2019) (same).  It also wards against the impracticalities of attempting to unscramble a transaction after it has been consummated.  *See, e.g.*, *Gimbel v. Signal Cos.*, 316 A.2d 599, 603 (Del. Ch. 1974) (describing "the various obstacles to such a remedy including, tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc. and a host of other problems which as a practical matter will make rescission very difficult indeed"), *aff'd*, 316 A.2d 619 (Del. 1974); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000) (observing that under Delaware law, "it is generally accepted that a completed merger cannot, as a practical matter, be unwound").

[222] JX-91, Amended APA §§ 1.6(b), 1.6(i).

The Amended APA does not set a firm date for the Closing. Rather, the Amended APA defines "Closing" as follows:

> 1.6    Closing
>
> (a)    Subject to completion or waiver of the closing conditions set forth below, the purchase and sale of the assets and the other transactions contemplated hereby . . . shall take place at a closing (the "Closing"), effective as of 12:01 a.m. EST (the "Effective Time") . . . on a date to be mutually agreed by the parties (the "Closing Date"), with the parties to use commercially reasonable efforts to cause the Closing Date to be not earlier than January 10, 2017 and not later than January 31, 2017.[223]

Under this language, the Closing is an event that occurs on a Closing Date, which was a date that the parties were required to "mutually agree[]" upon. The parties further agreed to use commercially reasonable efforts to cause to occur on or between January 10, 2017 and January 31, 2017.

To "mutually agree," parties must at a minimum achieve a meeting of the minds.[224] "In order for there to be an agreement, the parties must have a distinct

---

[223] *Id.* § 1.6(a).

[224] *See generally* 1 *Williston* § 3:2 ("A binding mutual understanding or so-called "meeting of the minds" (consensus ad idem) sufficient to establish a contract requires no formality or express language regarding every detail of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances."). *See also Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1212 (Del. 2018) ("One of the first things first-year law students learn in their basic contracts course is that, in general, 'the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.' In other words, there must be a 'meeting of the minds' that there is a contract supported by consideration." (internal quotation marks and citation omitted)).

intention common to both and without doubt or difference."[225] "An overt manifestation of assent"[226] is important, and "[t]he unexpressed subjective intention of a party is therefore not relevant."[227]

In this case, the Closing never occurred because the parties never mutually agreed on a Closing Date. The record reflects that Schubert proposed a January 31 Closing Date, but that proposal was not firm in view of Schubert's simultaneous suggestion that the parties give themselves "wiggle room" until February 3, and Oliver Street never overtly agreed to it in any event.[228] Wayne proposed a February 1 Closing Date and then as a compromise suggested a February 1 effective date, but DermSA never overtly agreed to that. At one point, Schubert sent an email that seemed to consent to Wayne's proposal, but he took back that consent eight minutes later.[229] Oliver Street never planned on a January 31 Closing Date. Rather,

---

[225] *Gleason v. Ney*, 1981 WL 88231, at *1 (Del. Ch. Aug. 25, 1981).

[226] *Acierno v. Worthy Bros. Pipeline Corp.*, 693 A.2d 1066, 1070 (Del. 1997).

[227] *Id.*; *see also* 1 *Williston* § 4:1 ("[I]t was long ago settled that secret, subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties.").

[228] JX-122 at 1 (1/24/17 email chain between Wayne, Schubert, Pitfield, and others).

[229] JX-121 at 1 (1/25/17 email chain between Schubert, Wayne, Parsons, and Castañeda); Trial Tr. at 163–64 (Schubert); *id.* at 276–86 (Wayne).

Oliver Street,[230] along with the deal lawyers,[231] was operating under the assumption that Closing would occur on February 1 at the earliest. Thus, the record reflects only confusion regarding the Closing Date; there was no meeting of the minds or overt manifestation of assent. The Closing Date was never agreed upon.

Because the Closing Date was never agreed upon, Plaintiffs argue that relevant deadline for termination is the date by which the Closing *should* have occurred under the Amended APA—"not later than January 31, 2017."[232] A January 31, 2017 deadline for termination would render Oliver Street's February 1, 2017 notice of termination untimely.

In advancing this construction of the Amended APA, Plaintiffs do not offer a contextual analysis. They do not cite to parol evidence, analogous decisional

---

[230] *See* JX-113 at 1 (1/22/17 email exchange among Wells, Wayne, and Pitfield, with Wells stating that they were "tentatively targeting" a closing date of February 1); Trial Tr. at 398 (Wayne confirming that JX-113 implied a February 1 closing date); JX-240 (1/24/17 email from Hinton to Ohlsen requesting "expected debt payoffs as of 2/1"); JX-256 (1/24/17 email from Oliver Street's lender confirming "closing date for DermSA is now 2/1" and ABRY representative confirming "[t]hat's right"); JX-223 (1/27/17 email from Hinton to Wells, Olsen, and Wayne asking: "[S]hould we still target 2/1 or something later [for DermSA]?"); JX-128 (1/27/17 email from Wayne to Rose and others stating that he "still ha[d] a 2/1 close date in sight"); JX-139 at 1 (1/28/17 draft email of Hinton theorizing that lease consents would be ready, which would "then put the burden back on [Oliver Street] to execute to allow for 2/1 closing").

[231] JX-116 at 1 (1/25/17 email chain between Castañeda and Pitfield copying others); JX-136 at 1 (1/27/17 email chain between Castañeda and Pitfield and others); JX-141 at 1 (1/30/17 email from Castañeda to Pitfield and others).

[232] JX-91, Amended APA § 1.6(a).

authority, or secondary sources that support their construction.[233] Rather, Plaintiffs appeal to the plain language of the Amended APA and abstract logic.

The plain language of the Amended APA does not support imposing a default deadline of January 31. Section 1.6(a) employs an efforts clause obligating the parties agreed to use their "commercially reasonable efforts" to cause the Closing Date to be not later than January 31, 2017.[234] Language like "commercially reasonable efforts" does not require the identified outcome. Rather, it requires parties to try to achieve the identified outcome.[235] In this case, it did not require that the Closing occur not later than January 31. Rather, it required that the parties try to

---

[233] Plaintiffs cite to a number of cases in which a court strictly enforced a contractual deadline. *See* Pls.' Post-trial Opening Br. at 30–31 (citing *In re Tel. Warehouse Inc.*, 124 F. App'x 724 (3d Cir. 2005); *Vintage Rodeo Parent, LLC v. Rent-a-Center, Inc.*, 2019 WL 1223026 (Del. Ch. Mar. 14, 2019); *Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849 (3d Cir. 2000)). Those cases are inapposite because none involved disputes over what constituted the contractual deadline, but rather, whether to enforce the deadline. *Tel. Warehouse*, 124 Fed. App'x at 728 (holding that bankruptcy court, even as court of equity, could not "use its equitable power . . . to ignore the parties' contractual agreements" where the parties did not agree to extend a deadline); *Vintage Rodeo*, 2019 WL 1223026, at *3 (declining to avoid the "startling conclusion" that a party missed a firm deadline by one day despite "having vigorously negotiated" the provision); *Nat'l Data*, 212 F.3d at 855 (noting a firm deadline was the product of "substantial negotiations" and declining to excuse a party's "failure to focus on this unambiguous clause in the contract").

[234] *See* JX-91, Amended APA § 1.6(a).

[235] *See generally Akorn*, 2018 WL 4719347, at *86–87 (describing efforts clauses, including clauses requiring "commercially reasonable efforts," and explaining that such clauses specify how hard the parties have to try to achieve a specified outcome); Lou R. Kling, Eileen T. Nugent & Brandon A. Van Dyke, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 13.06, at 13-44 (2020 ed.) (explaining that efforts clauses are expressed "as an attempt to achieve a desired result").

cause the Closing to occur not later than January 31. The plain language does not support enforcing a firm obligation where the parties expressly contracted for a soft one.

Plaintiffs' construction also would be illogical in view of the parties' contractual scheme. Often, parties to a transaction agreement identify a "drop-dead" or "outside" date, after which the agreement either automatically terminates or either party can freely terminate if certain conditions are not met.[236] The "commercially reasonable efforts" date range does not have that effect, and the Amended APA does not otherwise contain such provisions.[237] Where, as here, the parties fail to specify a drop-dead date, Delaware courts will keep the contract open for a "reasonable

---

[236] Kling, Nugent & Van Dyke, *supra* note 235, § 15A.02, at 15A4 ("Typical termination rights almost invariably include an outside date upon which either party can terminate, usually by providing written notice to the other . . . ."); *see also* ABA Mergers & Acquisitions Committee, *Model Asset Purchase Agreement* 276–77 (2010) (supplying sample termination provision under which a buyer can terminate "if satisfaction of any [closing condition] by _____ or such later date as the parties may agree (the "End Date") becomes impossible (other than through the failure of the [b]uyer to comply with its obligations)" and commenting that the End Date supplies a "*deadline* by which satisfaction of a condition either becomes impossible or the Closing has not occurred" (emphasis added)). The deadlines in the sample provision differ from the softer efforts clause used by the parties in this case.

[237] *See Rent-a-Center*, 2019 WL 1223026, at *7 (quoting termination provision allowing either party to terminate "upon written notice to the other party . . . if the Merger shall not have been consummated by [the End Date]"); *Akorn*, 2018 WL 4719347, at *190 (finding that the Outside Date served as a deadline for a seller to cure any breaches of a failure of a condition precedent because the termination provision allowed buyer to terminate "if the Effective Time shall not have occurred on or prior to [the Outside Date]").

period of time" to allow for performance.[238] Plaintiffs' construction of the parties' contractual scheme, which would require Oliver Street to terminate by the January 31, 2017 date regardless of when Closing was to occur, could result in a "reasonable period of time" where Oliver Street was obligated to perform but had no right to terminate on any basis. That makes no sense and is not a result for which a buyer would bargain.

For all of these reasons, the deadline for terminating under Section 7.1 is the Closing. Because the parties never agreed on a date to hold Closing, there was no deadline set for giving notice of termination under Section 7.1. Oliver Street is therefore correct that its termination notice was timely.

Oliver Street's success on this point has a self-defeating aspect to it. The presumption of consistent usage provides that "absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract."[239] Thus, the "at the Closing" language of Section 7.1[240] must be read to impose the same deadline, or lack thereof, as the "at the Closing"[241]

---

[238] Kling, Nugent & Van Dyke, *supra* note 235, § 15A.02, at 15A-4.1 (citing *Henkel Corp. v. Innovative Brands Hldgs.*, 2008 WL 4131566 (Del. Ch. Aug. 26, 2008)).

[239] *Comerica Bank v. Glob. Payments Direct, Inc.*, 2014 WL 3567610, at *11 (Del. Ch. July 21, 2014) (collecting cases); *see also* 11 *Williston* § 32:6 ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.").

[240] JX-91, Amended APA § 7.1.

[241] *Id.* §§ 1.6(b), 1.6(i).

language of Sections 1.6(b) and 1.6(i). That is, the deadline for giving notice of termination under Section 7.1 is the same deadline for satisfying closing conditions set forth in Section 1.6(b) and 1.6(i). Because the deadline for giving notice of termination did not pass, neither did the deadline for satisfying closing conditions. The main impact of this conclusion is that Oliver Street cannot cite the non-occurrence of a condition "at the Closing" as a basis for termination.

Oliver Street argues for an incongruous construction of the deadlines, urging the Court to treat the deadline for meeting closing conditions as the Closing Date, which it says was January 31, and to treat the deadline for terminating as the Closing, which did not occur. Oliver Street cites practical reasons for this construction. As defense counsel explained during post-trial argument, it is not uncommon for parties to be ironing-out last-minute details relating to closing conditions on the closing date, and to delay aspects of the closing—the release of signature pages and the payment of money—until those conditions are satisfied.[242] If the deadlines for giving notice of termination and satisfying closing conditions are synchronous, Oliver Street would be between a rock and a hard place, having to choose between (1) exercising its termination right and foregoing a transaction that the parties had worked towards closing for months, and (2) waiving its termination right permanently. To Oliver Street, it thus makes sense for the deadline to terminate

---

[242] Post-trial Oral Arg. Tr. at 39.

based on the non-occurrence of conditions to be *after* the deadline for satisfying those conditions.

There are many defects with Oliver Street's arguments. One obvious defect is that, as discussed above, the parties never mutually agreed upon a January 31 Closing Date. The other main defect in the proposed sequence of deadlines is that Oliver Street did not bargain for it. Under the Amended APA, the parties agreed that the right to terminate and the obligation to satisfy closing conditions would be subject to the same deadline—"at the Closing." Oliver Street bargained for the additional right to terminate *before* ("prior to") the deadline for satisfying the closing conditions if it was impossible to timely satisfy them, as is common.[243] But Oliver Street did not bargain for the right to terminate *after* the deadline for satisfying the closing conditions. In addition, the "rock and a hard place" dilemma Oliver Street posits is overblown. Although it is true that parties often run up against contractual deadlines, sophisticated deal lawyers routinely solve these problems by freely agreeing to amend or extend.

---

[243] *See Model Asset Purchase Agreement*, *supra* note 236, at 197 (supplying sample termination provision that buyer may terminate "[b]y notice prior to or at the Closing . . . if any condition . . . has not been satisfied . . . *or* if satisfaction of such a condition by such date is or becomes impossible" (emphasis added)); *id.* 198 (commenting that "the nondefaulting party may terminate . . . before the Closing if it is clear that a condition to that party's obligations cannot be fulfilled by the calendar date set for the Closing").

Oliver Street alternatively seeks asymmetrical enforcement of a January 31 deadline based on the Amended APA's non-waiver provision. That provision states that "[n]o failure to exercise or delay in exercising any *right, power or remedy* hereunder shall operate as a waiver thereof."[244] To Oliver Street, the emphasized language plays a key role. Oliver Street argues the non-waiver provision allowed it to delay exercising its termination *right* but did not permit Plaintiffs to delay satisfying the closing condition *obligations*.

Once again, the finding that January 31 was not the mutually agreed upon Closing Date renders Oliver Street's non-waiver argument largely beside the point. Oliver Street's interpretation of the non-waiver provision does not work in any event. To treat the non-waiver provision as impliedly extending the deadline for Oliver Street to exercise its termination right after Closing runs contrary to the purpose of the deadline. As Oliver Street argued, the purpose of a termination deadline is to prevent Oliver Street from unwinding the transaction after Closing. Oliver Street's broad interpretation of the non-waiver provision, however, would allow it to do just that. Worse, at its logical extreme, Oliver Street's interpretation of the non-waiver provision would lead to absurd results, allowing Oliver Street to "mutually agree" to close by a date certain, elect to close, and then exercise its termination right after. This is the sort of bizarre outcome that principles of contract

---

[244] JX-91, Amended APA § 8.3 (emphasis added).

interpretation require courts to avoid.[245]  Thus, Oliver Street's deadline for exercising its termination right was not impliedly extended by the non-waiver provision.[246]

In the end, the Closing is the deadline both to satisfy the closing conditions and to deliver the notice of termination.  The Closing never occurred.  Accordingly, the termination notice was timely, and Oliver Street cannot rely on the failure to satisfy closing conditions "as of the Closing Date" as a basis for termination.

## B.    The Closing Conditions

Because the lack of a firm deadline forecloses the first avenue for justifying termination under Section 7.1, the analysis turns to the second avenue, addressing "if satisfaction of such a condition by the Closing Date [was] or [became] impossible."[247]  Oliver Street cites the Landlord Consents condition and the Bring-down Provision as independent bases for termination, arguing that it would have been impossible to satisfy either at Closing.

---

[245] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[246] The cases on which Oliver Street relies to support its interpretation of the non-waiver provision are distinguishable because application of the non-waiver provision neither defeated the purpose of another provision of the agreement nor led to absurd results.  *See* Def.'s Post-trial Answering Br. at 23 (quoting *AgroFresh v. MirTech, Inc.*, 257 F.Supp.3d 643, 660 (D. Del. 2017), and citing *Pine River Master Fund Ltd. v. Amur Fin. Co.,* 2017 WL 4548143, at *18 (Del. Ch. Oct. 12, 2017), *aff'd*, 190 A.3d 996 (Del. 2018) (TABLE)).

[247] JX-91, Amended APA § 7.1.

### 1. Landlord Consents

The record reflects that it was possible to satisfy by the Closing Date the Landlord Consents condition. In fact, the record indicates that the landlords were ready, willing, and able to consent by the end of January 2017.[248]

On January 25, 2017, Pitfield consented to the form of assignment obtained from Inland.[249] Castaneda ironed out the remaining wrinkles with Inland in the days that followed.[250] On January 16, 2017, GGP reported that its lease committee approved the assignment.[251] GGP circulated final execution versions on January 31.[252]

---

[248] Binder Dep. Tr. at 57 ("Q. As of January 31st, was Inland ready, willing and able to consent to the assignment of the lease? A. Yes. . . . I don't have the sequence of dates from recollection, but based on this review and knowing at one point we were signed off and ready to move forward, I would agree with that statement, yes."); Schroeder Dep. Tr. at 57:2–10 ("Q. So as of January 16th, 2017, the lease committee had approved the assignment? A. That is correct.").

[249] JX-119 at 1 (1/25/17 email from Pitfield to Castañeda copying others).

[250] JX-126 at 1 (1/26/17 email from Castañeda to Inland copying Wayne, Pitfield, and others); JX-131 at 1–2 (1/27/17 email chain between Castañeda and Inland, copying others).

[251] JX-110 at 1 (1/16/16 email from GGP to Wells copying others); *see also* JX-108 (1/12/17 email chain from between Wells and GGP where GGP informs Wells that it would need to present the proposed assignment to its "lease committee," and Wells follows up a week later to learn that the lease committee meeting had been rescheduled for January 16); JX-120 at 1–2 (1/25/17 email chain among Wells and GGP confirming that Wells should receive a draft of the consent by January 26).

[252] JX-147 at 1 (1/31/17 email from GGP to Castañeda copying Pitfield and others requesting that Castañeda "1. Print three (3) copies of the PDF on legal size papers; 2. Sign and witness (where applicable); and 3. Mail all three Tenant-executed copies to my attention at the address below [in Chicago]").

Thus, as Castañeda declared, the Landlord Consents were likely to be finalized by the morning of January 31.[253] Even Wayne could not have been surprised at this development, since he never doubted that the Landlord Consents would be ready on time.[254] Because it was possible to satisfy this condition at Closing, its purported failure cannot serve as the basis for Oliver Street's termination.

### 2. Bring-down Provision

Before turning to an analysis of the Bring-down Provision, it is appropriate to ask whether Oliver Street should be permitted to rely on it as a basis for termination in view of Oliver Street's strategic decision to avoid citing to it in February 2017. To recap, the record reflects that Oliver Street was actually terminating due to changes with the DermSA business, but it initially withheld that reason from Plaintiffs and the lenders, citing the Landlord Consents condition as the only express basis for termination.[255] This duplicity begs the question of whether Oliver Street should be permitted to augment its bases for termination in this litigation.

---

[253] JX-144 at 3 (1/31/17 email from Castañeda to Pitfield stating that "as of this morning, the last of the three landlord consents was finalized"); *see also* JX-146 at 1 (1/31/17 email from GGP to Castañeda copying Pitfield and others attaching execution versions of GGP consents); JX-147 at 1 (same); JX-148 at 1 (same).

[254] JX-139 at 2 (1/28/17 email from Wayne to Rose copying others stating Wayne's belief that the consents would be ready on either January 30 or January 31).

[255] *See supra* Section I.H.4.

The short and perhaps unsatisfactory response is that Plaintiffs were not harmed by Oliver Street's partial contrivances. In its February 2, 2017 letter, Oliver Street flagged that there might be other reasons for termination, stating that its basis for termination were "not limited to" the failure to obtain the required landlord consents."[256] This is not the sort of language that gives rise to waiver or estoppel arguments. Nor was this a situation in which the party terminating the contract lacked a proper basis for doing so. As will be discussed next, Oliver Street was within its contractual rights to terminate on the basis of the Bring-down Provision. Plaintiffs did not rely upon Oliver Street's February 2017 communications to their detriment, and Oliver Street identified its true reasons for termination timely in this litigation. To Plaintiffs' credit, they make no argument that equity should cabin Oliver Street to the specific bases for termination disclosed in February 2017. In this case, the lack of complete candor was a shame but largely harmless.

Turning to the merits of the issue, the record reflects that it was impossible to deliver the Bring-down Certificate at Closing.

The Bring-down Provision required Plaintiffs to certify: "All of [Parsons's], [Management's] and DermSA's representations and warranties in this Agreement shall be true and correct in all material respects as of the Closing Date with the same

---

[256] JX-155 at 2.

effect as though made at and as of such date . . . ."[257]  Oliver Street contends that, because Saap and Opeola submitted notices of their intent to resign post-signing, Plaintiffs could not have provided this certification as to their representation in Section 3.16, that "to the knowledge of Seller, no Business Employee intends to terminate his or her employment with or service to Seller."[258]

Plaintiffs concede that the representation of Section 3.16 would have been inaccurate as of the Closing Date due to Saap's and Opeola's resignations.[259]  They argue, however, that the representation remained "true and correct *in all material respects*."[260]  They further ague that, under the Bring-down Provision, the representation of Section 3.16 need only be true and correct as of the date of signing.

In *Akorn*, Vice Chancellor Laster had occasion to study the meaning of the phrase "in all material respects" as used in a merger agreement covenant.  After carefully surveying case law and treatises on this issue, the Vice Chancellor

---

[257] JX-91, Amended APA § 1.6(i)(1).

[258] *Id.* § 3.16.

[259] Trial Tr. at 175 (Schubert testifying:  "Q.  Okay.  So as of January 31, 2017, the statement, 'To the knowledge of Seller, no Business Employee intends to terminate his or her employment with or service to the Seller,' that was no longer true as of January 31st, 2017; correct?  A.  That's correct."); *id.* at 267–68 (Parsons testifying:  "Q.  But that representation was not true as of January 31, 2017.  Right?  A.  That is true."); *id.* at 58 (Castañeda testifying:  "Q.  And so you will agree with me that the representation and warranty that, 'To the knowledge of Seller, no Business Employee intends to terminate his or her employment with or service to Seller,' that that representation and warranty itself was no longer true on January 31st or February 1st of 2017; correct?  A.  That's right.").

[260] JX-91, Amended APA § 1.6(i)(1) (emphasis added).

concluded that drafters use the phrase "in all material respects" in contractual conditions "to eliminate the possibility that an immaterial issue could enable a party to claim breach of the failure of a condition."[261] "Build[ing] on the standard for materiality under disclosure law," the Vice Chancellor articulated that the "in all material respects" standard requires a "substantial likelihood that the . . . fact [of breach] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information."[262] Put differently, the "in all material respects" language "strives to limit the operation of the [closing condition] to issues that are significant in the context of the parties' contract, even if the breaches are not severe enough to excuse a counterparty's performance under a common law analysis."[263] The standard excludes those "small, *de minimis*, and nitpicky issues that should not derail an acquisition."[264]

Applying the standard set forth in *Akorn*, it is clear that the departures of Saap and Opeola were material. The physicians were DermSA's primary revenue drivers, and the departing physicians generated 11% of the total revenue in 2016, the year

---

[261] *Akorn*, 2018 WL 4719347, at *85.

[262] *Id.* at *86.

[263] *Id.*

[264] *Id.* at *85; *see also Channel Medsys.*, 2019 WL 6896462, at *17 (adopting the "disclosure-based standard that *Akorn* endorses in evaluating the alleged inaccuracies of representations" in a merger agreement).

prior to the transaction. This Court has found adjustments and errors of comparable size in actual or projected revenue to be material.[265]

As trial, Oliver Street established that the physicians' departures materially affected DermSA's projected revenue as well. DermSA did not prepare projections for 2017. For the purpose of establishing damages at trial, Plaintiffs introduced the expert testimony of Saul Solomon,[266] who developed financial projections for DermSA as part of his analysis using information provided by DermSA management. In doing so, he reduced DermSA's projected income to account for

---

[265] *See, e.g.*, *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *38 (Del. Ch. Oct. 16, 2018) (finding that projections based off a 10% cut to revenue were material in the context of stockholder approval of a merger when those projections provided "one of only two valuations that the directors possessed when they negotiated the price of the deal"), *aff'd*, 211 A.3d 137 (Del. 2019); *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 57–58 (Del. Ch. 2015) (holding at dismissal stage that misstatement of monthly sales revenues by 10% was sufficient to infer that disclosures regarding "financial condition" of company were not true "in all material respects"); *see also In re Rural Metro Corp.*, 88 A.3d 54, 104–05 (Del. Ch. 2014) (finding that 10% departure from consensus EBITDA was material and needed to be disclosed), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *IAC Search, LLC v. Conversant LLC*, 2016 WL 6995363, at *12 (Del. Ch. Nov. 30, 2016) (reasoning at dismissal stage that a misstatement of transactions with a cumulative value of $253,000 in the context of a $90 million deal was sufficient to infer that financial statements were not true "in all material respects").

[266] JX-191, Expert Report of Saul Solomon ¶ 5. Oliver Street introduced its own valuation expert, James L. Canessa, to rebut Solomon's testimony. *See* JX-195, Rebuttal Report of James L. Canessa. Canessa does not address the materiality of the physician departures.

the departures of Saap and Opeola.[267]   At trial, Solomon testified that this lost revenue was "a couple million dollars" and "substantial," "not minimal."[268]

Oliver Street's reaction to the news of the physicians' departures, as reflected in the contemporaneous evidence, further demonstrates that Oliver Street viewed the information as "significant in the context of the parties' contract."[269]   After Opeola's departure, Oliver Street requested a list of the non-renewal notice deadlines for the other DermSA physicians.[270]   After Schubert provided these the following day,[271] Wayne followed up the day after to better understand the financial impact of the two departures.[272]   He requested information concerning the collections of the departing

---

[267] JX-191, Expert Report of Saul Solomon ¶ 32; *see also* Trial Tr. at 426 (Solomon explaining on direct that DermSA experienced a "big decline in EBITDA" in part due to "the three doctors who had already noticed their resignations as of January 31"); *id.* at 492 (Solomon explaining on cross that he adjusted historical EBITDA downward "to project what we thought was going to happen with the doctors that were leaving").

[268] Trial Tr. at 496 (Solomon); *see also id.* (Solomon agreeing that the impact of their departures would be "substantial" and crediting Wayne's testimony in concluding that "the revenue was going to be impacted significantly").   When asked whether the lost revenue was "material" in his view, Solomon concluded in no uncertain terms that "I think that a couple million dollars of revenue is material to this business from the standpoint of value." *Id.* at 497 (Solomon).   Although Solomon qualified this statement by noting that "material" can have different meanings in different contexts, he later testified on cross that "two doctors left, and that materially harms the value of [DermSA]." *Id.* at 497, 493.

[269] *Id.*

[270] JX-118 at 1 (1/25/17 email from Wayne to Schubert copying others).

[271] JX-125 at 1 (1/26/17 email from Schubert to Wayne and others attaching schedules).

[272] JX-224 at 4–5 (1/27/17 email from Wayne to Parsons and Schubert); *see also* Trial Tr. at 373–75 (Wayne testifying on cross examination: "[W]e wanted to understand their perspective on what the impact to the organization would be.   How would they be able to mitigate the loss of [Opeola's] production?").

doctors in 2016 and how many support staff positions would be eliminated as a result of their departure.[273]  At trial, Wayne explained that this information was crucial because "two doctors leaving [would] have a material financial impact to the business."[274]  Even Parsons admitted at trial that upon hearing of Saap's and Opeola's resignations, Oliver Street expressed immediate "concern[]" and "wanted to know the financial impact."[275]

The parties' negotiation history corroborates that the physicians' departure were "significant in the context of the parties' contract."[276]  At each turn, Oliver Street was primarily concerned with attracting the physicians and keeping them on board with the transaction.  During Oliver Street's original diligence in May 2016, Oliver Street identified the problematic anti-assignment provision in the physician contracts and required that *every* physician sign an amendment overriding the

---

[273] JX-224 at 4 (1/27/17 email from Wayne to Parsons and Schubert).

[274] Trial Tr. at 334 (Wayne); *see also* JX-35 at 1 (6/1/16 email from Wayne to Parsons and Schubert copying Wells stating that a failure of any physician to sign the employment agreement amendment "would leave any buyer with an enormous amount of risk and uncertainty, which does not merry up with paying a premium purchase price"); JX-66 at 1 (10/4/16 email from Pitfield to Castañeda and others stating that DeSilva's departure "impacts EBITDA materially"); Trial Tr. at 383 (Wayne on cross examination:  "Q.  So every doctor that leaves decreases the value of the company?  A.  Yes.").

[275] Trial Tr. at 242 (Parsons).  Plaintiffs argue that Oliver Street waived its right to terminate based on the materiality of physician departures by not raising the issue after Saap's resignation.  The reality is that departures had a cumulative effect, and Oliver Street raised its concerns with Parsons and Schubert in a timely manner once, in their view, a materiality threshold was reached.

[276] *Akorn*, 2018 WL 4719347, at *86.

provision.[277]  After some negotiation, Oliver Street settled on requiring only twelve physicians to sign an amendment but still imposed a $1 million penalty for each doctor short of fourteen.[278]  Oliver Street repeatedly emphasized the importance of meeting with the physicians directly to win them over because any lack of buy-in "could leave Oliver Street without a business."[279]  When DeSilva resigned, Oliver Street expressed disappointment regarding the associated lost revenue and reduced the up-front cash payment accordingly by $1 million, 10% of the up-front payment at the time.[280]  The physicians were Oliver Street's primary concern from day one of negotiations, and both parties knew that any departures would have consequences.[281]

---

[277] JX-205 at 1 (5/26/16 email from Wayne to Schubert copying Parsons).

[278] JX-207 (6/10/16 email from Pitfield to Wayne and Wells).

[279] Trial Tr. at 308 (Wayne); *see also* JX-36 at 1 (6/2/16 email from Rose to Wayne stating that the physicians were "99% of the asset value").

[280] JX-66 at 1 (10/4/16 email from Pitfield to Castañeda copying various people stating: "We are surprised and disappointed that Dr. DeSilva has chosen to leave the practice based on the communications to date regarding the likelihood of the doctors remaining with the practice.  This impacts EBITDA materially and raises strong concern about what the remaining doctors will do.").

[281] Plaintiffs also argue that emails sent by Wayne in September 2016 and October 2016 demonstrate that Oliver Street agreed to bear the risk of any physicians departing between signing and closing.  *See* JX-66 (9/19/16 email from Wayne to Schubert and others explaining the shift from a "penalty" model to an "incentive" model such that Plaintiffs' consideration was not reduced if physicians did not "come along under the new contracts"); JX-69 at 2–4 (10/18/16 email from Wayne to Castañeda, Schubert, and Parsons stating that Oliver Street would forego a meeting with the doctors if Plaintiffs would accept a "purchase price reduction [that] would account for the increased risk [Oliver Street was] assuming").  At most, the emails reflect that Oliver Street bore the risk that some physicians would not sign additional employment agreement amendments between signing and closing, not that any physicians would resign altogether.

67

Thus, the departures of Opeola and Sapp were material in this context, and the Bring-down Certificate could not be delivered at Closing because Plaintiffs' representation and warranty in Section 3.16 was not true "in all material respects."

To avoid this outcome, Plaintiffs argue that under the Bring-down Provision, the representations and warranties in Section 3.16 need only be true as of signing. They rely on a specified-date exception to Section 3.16 that requires "those representations and warranties that address matters only *as of a specified date*, . . . shall be true and correct in all material respects *as of that specified date*."[282] They point to language in the preamble of Article 3, which states that "each of the statements contained in this Article 3 is true and correct *as of the date of this Agreement*."[283] According to Plaintiffs, *all* of the representations and warranties in Article 3 fall within the specified-date exception to the Bring-down Provision as a result of the "as of the date of this Agreement" language in the preamble. Under this interpretation, Plaintiffs were only required to certify that "no Business Employee intends to terminate his or her employment with or service to Seller" as of the date of signing.

Plaintiffs' construction of the Amended APA fails for two reasons. First, if Plaintiffs' reading of the Amended APA were correct, the language of

---

[282] JX-91, Amended APA § 1.6(i)(1).

[283] *Id.* art. III pmbl.

68

Section 1.6(i)(1) requiring certification that Plaintiffs' representations and warranties were true "as of the Closing Date" would be rendered a nullity, because all of Plaintiffs' representations and warranties are found in Article 3 and would be subject to the specified-date exception. Delaware law rejects interpretations of contracts that render provisions null and void.[284] Second, Plaintiffs' reading of the Bring-down Provision undermines the well-understood function of that condition, which is to "protect[] each party from the other's business changing or additional, unforeseen risks arising prior to closing."[285] If the Bring-down Provision need only be true as of the signing, then it would not achieve its purpose of protecting against business changes that arise between the signing and closing.

In sum, Plaintiffs could not possibly have satisfied the Bring-down Provision at Closing. Oliver Street was therefore within its right to terminate the Amended APA under Section 7.1.[286]

---

[284] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."); *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992) ("The cardinal rule of contract construction is that, where possible, a court should give effect to *all* contract provisions."); *Rent-a-Center*, 2019 WL 1223026, at *13 ("[A]ll the provisions are assumed to have meaning.").

[285] Kling, Nugent & Van Dyke, *supra* note 235, § 14.02[1], at 14-9; *see also* Trial Tr. at 52–53 (Castañeda); *id.* at 341 (Wayne).

[286] Because the Court concludes that Oliver Street did not breach the Amended APA, it does not reach the issue of damages. This moots Oliver Street's pending motion to exclude evidence related to Plaintiffs' damages calculations, *see* Dkt. 121, which the Court held in abeyance pending trial, *see* Dkt. 152 at 13–14.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Oliver Street.